# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SKYE MINERAL INVESTORS, LLC and CLARITY COPPER, LLC, directly and derivatively on behalf of SKYE MINERAL PARTNERS, LLC, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) Misc. Pro. No. 18-00101 |
| v. | ) (LSS) ) |
| DXS CAPITAL (U.S.) LIMITED, PACNET CAPITAL (U.S.) LIMITED, MARSHALL COOPER, SANJIV NORONHA, WATERLOO STREET LIMITED, LIPPO CHINA RESOURCES LTD., MICHAEL RIADY, STEPHEN RIADY, and NOBLE AMERICAS CORP., | ) ) ) [Case No. 2018-0059-JRS, ) Delaware Court of Chancery] ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| SKYE MINERAL PARTNERS LLC, | ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED AMENDED COMPLAINT

Plaintiffs, Skye Mineral Investors, LLC ("SMI") and Clarity Copper, LLC

("CC"), individually and derivatively on behalf of Skye Mineral Partners, LLC

("SMP"), by their attorneys, for their Verified Amended Complaint against

Defendants, DXS Capital (U.S.) Limited ("DXS"), PacNet Capital (U.S.) Limited

("PacNet"), Marshall Cooper, Sanjiv Noronha, Waterloo Street Limited

("Waterloo"), Lippo China Resources Ltd. ("LCR"), Michael Riady, and Stephen Riady (together with DXS, PacNet, Cooper, Noronha, Waterloo, LCR, and Michael Riady, the "Lippo Defendants" and together with their other agents and affiliates, the "Lippo Group" or "Lippo"), and Noble Americas Corp. ("Noble"), hereby allege as follows:

## NATURE OF THE ACTION

1.      In this case, SMI and CC seek to redress the harm they suffered and SMP suffered as a result of Defendants' misconduct as part of an illicit scheme to benefit themselves at the expense of SMI, CC, and SMP.  The Lippo Defendants fraudulently induced SMI and CC to contribute millions of dollars to the parties' joint venture, SMP.  The Lippo Defendants coupled those actions with a campaign of impermissible activities designed to destroy the value of SMI's and CC's equity investments, including by utilizing confidential information to secretly and fraudulently acquire debt secured by almost all of the assets of SMP's subsidiary, CS Mining, LLC ("CSM" or the "Subsidiary"), and using the toxic combination of their newly acquired status of senior secured noteholder and existing powers as SMP's manager/controller to extinguish their partners' equity investments and divest SMP of its membership interest in the Subsidiary.

2.      SMP has four members:  Plaintiff SMI, Plaintiff CC, Defendant DXS, and Defendant PacNet.  At all relevant times, virtually all of SMP's assets

2

consisted of its membership interest in CSM, which is in the business of mining and processing copper, gold, silver and other minerals in Milford, Utah.  SMP effectively wholly-owns and is the majority member of, CSM.

3.      Defendants' illicit scheme harmed SMI and CC directly in several ways, causing them to lose the value of their investments.  The multiple direct causes of action set forth below seek to redress that harm.  Defendants' misconduct also harmed SMP, including by divesting SMP of its membership interests in its Subsidiary, which harm SMI and CC are seeking to redress through the (single) derivative causes of action asserted in this complaint.

4.      Defendants' misconduct also may have harmed other parties, including CSM, but Plaintiffs are not asserting claims to recover for the harm suffered exclusively by those other parties.  This complaint does not assert any legal claims that CSM (SMP's subsidiary) ever owned itself.  Those claims were property of CSM, a non-party to this lawsuit, which subsequently disposed of its assets through a bankruptcy proceeding.

5.      The Lippo Group consists of a global network of entities primarily owned and operated by, and primarily for the benefit of, the Riady family – a multi-billion dollar family based in Indonesia with broad business dealings around the world, including in real estate, mining, telecom, infrastructure, healthcare, and technology, and with a prior track record of illicit dealings.

3

6.     During the relevant period, the Lippo Group effectively controlled SMP's and (through SMP) its Subsidiary's operations, and it acted through its network of associates, agents, and affiliate entities, including DXS, PacNet, Noronha, and Cooper, the latter of whom served as a Manager and Chairman of the Board for SMP (and separately for its Subsidiary) and as DXS's and PacNet's agent.

7.     DXS, for instance, possessed negative control rights under SMP's Operating Agreement, through which it could (and did) prevent potential funding transactions, among many other fundamental decisions and operational activities. Through those powers, DXS exercised effective control over SMP's financial condition, including by dictating the terms of any financing transactions and/or preventing SMP or its Subsidiary from consummating potential financing transactions.

8.     The Lippo Group secretly hatched a plan to exploit this control over SMP to depress the value of SMP and its assets and slow their progress, with the goal of capitalizing on those conditions.  The Lippo Group then furthered its secret plan by secretly and fraudulently entering into an agreement to acquire the debt secured by CSM's assets and misrepresenting to SMI, CC, and SMP that it had not done so and had no intention of doing so.  The Lippo Group concealed from

4

Plaintiffs its plan to exploit its negative and total operational control for its own benefit and to SMI's, CC's, and SMP's detriment.

9.    In particular, the Lippo Group executed on a covert plan to (i) use its control in bad faith to starve SMP for cash, which funds SMP needed to fund business operations of its Subsidiary, and thereby cause the Subsidiary to default on a loan held by a senior creditor (the "Noble Loan"); (ii) collude with Noble, the lender on the Noble Loan, to defraud Plaintiffs and SMP into agreeing to approve an amendment of the terms of the Noble Loan to eliminate the critical protection that precluded Noble from selling the loan without authorization; (iii) secretly purchase the Noble Loan in order to acquire for itself senior secured creditor status over SMP's assets; (iv) induce continued equity investment by Plaintiffs throughout the course of the scheme while secretly plotting to drive down the value of that equity to zero; (v) abuse its control over SMP, together with its newly acquired leverage over SMP and its Subsidiary as a senior secured creditor through the Noble Loan, to further enhance its creditor position relative to other lenders; and (vi) starve SMP of capital until the Lippo Group could use its senior creditor position to acquire CSM's core assets and divest SMP of its interest therein, thereby squeezing out SMP (and thus SMI and CC), and keeping the tens of millions of dollars that SMI and CC had already invested to develop the mining

5

assets and the hundreds of millions in value that SMP's, SMI's and, CC's equity represented.

10.    The Lippo Group internally (including the Board of LCR) had "conservatively" estimated that the value of the assets it would acquire was worth at least $600 million at the time it perpetrated its secret scheme based on confidential information received by Cooper which he had not shared with other Board members, and their scheme represented an opportunity to secure extremely valuable assets for a fraction of their value.

11.    The entities and individuals within the Lippo Group thus acted on material conflicts of interest and acted in favor of the Lippo Defendant's interest, at the expense of SMP's and its other members' interest in growing the value of their equity and their assets, and, at the very least, maintaining their solvency and furthering their success.

12.    In 2015, the Lippo Group began to implement the initial stages of its plan by preventing SMP from consummating favorable financing transactions.

13.    The Lippo Group also secretly was negotiating – misusing confidential information that the Lippo entities had obtained through the Lippo entities' and agents' Board and member capacities – with Noble to acquire the Noble Loan.

6

14.     But the Lippo Group's willingness to negotiate against SMP, SMI, and CC, and to do so behind their backs was not enough:  Lippo and Noble desired to get SMP, SMI, and CC to change the terms of the Noble Loan in order to execute the illicit plan.  That is because the Noble Loan Agreement prohibited Noble from selling the Noble Loan and associated equity warrants to a non-affiliate of Noble, such as the Lippo Group.

15.     Knowing that SMI, CC, and SMP would not sign-off on authorizing Noble to sell the loan to the Lippo Group because of the severe conflicts of interest that it would create, the Lippo Defendants executed the next stage of their plan.  In late 2015, they conspired with Noble to fraudulently induce Plaintiffs and SMP to amend the Noble Loan Agreement to eliminate the provision that prohibits the sale of the Noble Loan to a non-affiliate of Noble.

16.     The Lippo Group's greed did not end there.  After reaching the secret agreement to acquire the Noble Loan from Noble, the Lippo Group fraudulently induced SMI and CC to invest an additional $6.8 million that the Lippo Group was planning to take for itself shortly thereafter.  All the while, the Lippo Group represented to SMI, CC, and SMP that there were no secret dealings with Noble – knowing that Plaintiffs never would have invested any funds if the Lippo Group had planned (or as it turned out already had agreed) to acquire the Noble Loan for itself.

7

17.     Defendants concealed all of this from SMI, CC, and SMP until, in late December 2015, Plaintiffs were accidentally copied on an email that revealed part of Defendants' self-serving plans.  Deeply alarmed, SMI, CC, and SMP promptly and vehemently objected to the sale on December 30, 2015.  Defendants ignored Plaintiffs' objections, and the Lippo Group, through Waterloo, closed on its acquisition of the Noble Loan the next day.

18.     The Lippo Group acted to improve its position as creditor and continued to starve SMP for capital, including by unreasonably blocking, or refusing to consider or engage with respect to, favorable and much-needed financing transactions.

19.     Unfortunately for Plaintiffs and SMP, the Lippo Group's plan worked. SMP was divested of its equity interest in CSM when CSM was forced into bankruptcy in June 2016, and the Lippo Group (through yet another affiliate) acquired all of CSM's assets[1] for approximately $40 million.  That figure was less than 10% of its internal, "conservative" $600 million valuation, less than 43% of the approximately $93.7 million cash equity funds SMP's equity holders had invested in SMP, and less than 28% of the $144.5 million cash funds invested in SMP and the CSM mining project.

---

[1] This action does not challenge the bankruptcy sale process itself, which was conducted in the wake of the destruction in value that Defendants' actions had caused.

8

20.     All of Plaintiffs' investments in SMP – including their $6.8 million December 2015 investment which, unbeknownst to Plaintiffs, actually had post-dated Lippo's secret deal with Noble – and their longstanding equity shares therein were extinguished.  SMI and CC were left with nothing.

21.     Having acquired the assets for itself, the Lippo Group proceeded to enjoy a windfall benefit from its breaches of its fiduciary duties, its contractual obligations, and its common law obligations, in addition to Noble's breaches of its obligations, which furthered the Lippo Group's illicit scheme.

## LACK OF JURISDICTION

22.     This Court lacks either core or non-core jurisdiction.  Plaintiffs have only filed this amended complaint in this Court because Defendants improperly removed it to this Court.  A motion to remand is pending.  Plaintiffs do not consent to adjudication in this Court.

## THE PARTIES

23.     Plaintiff SMI is an Ohio limited liability company and is a member of SMP.

24.     Plaintiff CC is a Delaware limited liability company and is a member of SMP.  Plaintiffs SMI and CC together represent two-thirds of the managers on the Board of Managers for SMP and approximately 71.94% of the Class A equity ownership of SMP and approximately 69.11% of the fully diluted equity.

9

25.     Defendant DXS is a Delaware corporation and a member of SMP.  On information and belief, Lippo China Resources Limited ("LCR"), a multi-billion dollar conglomerate, owns and controls DXS, and at all relevant times DXS acted on LCR's behalf or at LCR's direction.

26.     Defendant PacNet is a Delaware corporation and a member of SMP. LCR, on information and belief, owns and controls PacNet, and at all relevant times PacNet acted on LCR's behalf or at LCR's direction.

27.     Defendant LCR is an entity that owns and controls DXS and PacNet and, on information and belief, is owned and controlled by the Riady family, and/or its affiliates and controlled parties.  The actions of Defendants Cooper, Noronha, DXS, PacNet, and Waterloo, as described herein, were taken on LCR's behalf or at LCR's direction.

28.     Defendant Marshall Cooper is an individual residing in Jakarta, Indonesia.  DXS and PacNet appointed Cooper, as their agent, to the Board of Managers of both SMP and CS Mining.

29.     Defendant Sanjiv Noronha is an individual residing in Singapore.  On information and belief, Noronha is affiliated with LCR.  DXS designated Noronha as the "DXS Representative" at SMP, pursuant to DXS's rights under the SMP operating agreement.

10

30.     Defendant Michael Riady is an individual residing in Florida.  He is a grandson of Mochtar Riady, the patriarch of the Riady family, and has been at all relevant times a lead representative for the Riady family (and thus the Lippo Group) since its investment in SMP.

31.     Defendant Stephen Riady is an individual residing, on information in belief, in Singapore.  He is a grandson of Mochtar Riady, the patriarch of the Riady family, and has been at all relevant times directly involved in the Riady family's Company-related activities (and thus the Lippo Group's activities) since its investment in SMP.

32.     Defendant Waterloo is a British Virgin Islands company.  LCR, on information and belief, owns and controls Waterloo.

33.     Defendant Noble is a Delaware corporation.

## BACKGROUND

### I.   The Structure of SMP

34.     SMP has four members:  DXS, PacNet, SMI, and CC.  Virtually all of SMP's assets consist of its membership interest in, and secured loan to, CSM, an entity that it formed in 2011 as a midmarket mining company that holds a large land position in the Milford Mineral Belt near Milford, Utah.  CSM was in the business of mining and processing copper, gold, and silver.

11

35.    SMP owns more than 99% of CSM and is its managing and majority member.

36.    SMP's equity structure is as follows (percentages approximate):



## II.    The SMP Operating Agreement

37.    The parties' rights and obligations are governed by, among other things, the Third Amended and Restated Limited Liability Company Agreement of SMP (the "SMP Agreement").  Delaware law governs the SMP Agreement.

38.    The SMP Agreement permits DXS and PacNet to appoint a designee to the Board of Managers of each of SMP and CSM.  Each of DXS and PacNet appointed Cooper as its designee to each Board of Managers.

12

39.     Each of SMI and CC appointed designees to the Board of Managers for SMP and CSM.

40.     Section 5.1 of the SMP Agreement provides that "[e]xcept as otherwise provided in this Agreement . . . or by the Act, the business and affairs of the Company will be managed and all Company powers will be exercised by or under the direction of the Board of Managers."

41.     Section 5.1(g) of the SMP Agreement provides that "a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders."

42.     Section 4.6 of the SMP Agreement requires the consent of 75% of the members, "excluding . . . Interested Members," for it to act on many material transactions, including certain financing transactions.  The SMP Agreement defines "Interested Members" as:

> [W]ith respect to any matter presented for approval of the Members, any Member to the extent that such Member or any Affiliate of such Member has a personal interest in the matter presented for approval which interest, on a Per Unit basis, is economically disproportionate to the interests of the other Members in such matter.

43.     Section 3.5 of the SMP Agreement, addressing the issue of member loans, provides:

> [T]he Board of Managers is authorized to cause the Company to engage in such borrowing [from Members] . . . . The Board of Managers shall reasonably determine

13

the amount of a loan to be requested and the terms of such loan. To the extent any Member is making any such loan to the Company, each Member shall be entitled, but not required, to make its pro rata share (based on the Members' relative number of Units) of any such loans to the Company.

44.    Board of Managers authorization was thus required for a member to possess a loan made to the company, and even where such a loan was authorized, the other members were entitled to participate on a pro rata basis.

45.    Section 5.1(l)(ii) of the SMP LLC Agreement also imposes critical confidentiality obligations on DXS and Noronha:

> DXS agrees, and shall procure that the DXS Representative agree in writing, to hold in confidence and trust all information provided to it or learned by it in connection with its rights under this Agreement; except to the extent disclosure of such information is required by law or any other regulatory process to which the DXS Representative is subject, in which case DXS shall provide notice of such required disclosure as early as practicable in order to permit the Company to seek a protective order or similar relief with respect to the disclosed information.

**III.    The 2014 Noble Loan Helps Finance CSM's Growth**

46.    CSM owned two major processing circuits consisting of (i) a flotation mill that produces a powder-like copper-gold-silver concentrate product, and (ii) a newly constructed vat-leaching and solvent-extracting electrowinning facility that produces pure copper cathode sheets (the "Phase II Facility").

14

47.     The Phase II Facility was constructed as part of a growth strategy.  It

was financed by SMP's equity holders (through capital investments amounting to

approximately $40 million) and through a project finance senior debt facility of

approximately $30 million (the Noble Loan).

48.     The parties documented the Noble Loan in a Loan and Security

Agreement, dated August 12, 2014 (the "Noble Loan Agreement").

49.     Section 9.07(b) of the Noble Loan Agreement provides that:

> The Lender may at any time with prior notice to the
> Borrower, assign to one or more Eligible Assignees all or
> a portion of its rights and obligations under this
> Agreement… pursuant to documentation acceptable to
> the Lender and the assignee.

50.     Section 9.07(f) of the Noble Loan Agreement provides that:

> "Eligible Assignee" means (a) an Affiliate of the Lender
> and (b) any other Person (other than a natural person)
> approved by the Borrower (such approval not to be
> unreasonably withheld or delayed; provided that no such
> approval shall be required if an Event of Default has
> occurred and is continuing.

51.     The purpose of these critical restrictions on Noble's ability to sell or

assign the Noble Loan was, among other things, to prevent parties with an interest

in SMP (e.g., members or lenders) from securing the substantial leverage over

SMP that the Noble Loan Agreement provided.

52.     At the same time that they executed the Noble Loan Agreement, the

parties also executed a seven-year offtake agreement (the "Offtake Agreement"),

15

through which Noble would be the exclusive buyer of the metals produced by

CSM, at a valuable discount to the then-prevailing market rates.

## IV.   The Lippo Group Blocks SMP from Securing Capital in Furtherance of Lippo's Plan to Acquire the Noble Loan and Conceal Lippo's Debilitating Conflicts of Interest

53.     Beginning in 2014, DXS and PacNet – through Cooper – began to

block reasonable financing proposals for SMP.  They refused, for example, to

support a pro-rata equity round for SMP in late 2014 and early 2015, despite

knowing that it needed capital to fund its Subsidiary's obligations under the Noble

Loan Agreement.

54.     These financing opportunities were important to SMP because they

would have enhanced its ability to ensure that CSM met its debt obligations, and

they would have supported the Phase II project.  If the Lippo Group had not

blocked SMP from accepting the financing offered to it or CSM during this period,

the second $15 million draw down under the Noble Loan would have occurred

months earlier than it actually did, such that Phase II would have been timely

completed, and creditors would have been paid off, positioning SMI and CC to

realize the value of their equity investments in SMP.

55.     In blocking reasonable financing opportunities, Cooper purported to

exercise DXS's rights under Section 4.6(b) of the SMP Agreement.  That section

effectively provided DXS (and thus the Lippo Group) blocking control over SMP

16

by prohibiting it from undertaking a variety of fundamental actions without DXS's permission.  That included, for example:

- Approving an annual budget;
- Taking on material debt;
- Issuing equity;
- Granting security interests in SMP or CSM assets;
- Appointing SMP and CSM management;
- Commencing or settling any material litigation; or
- Forming a new subsidiary.

56.     Section 4.6(b) of the SMP Agreement also provided negative controls to PacNet, including with respect to proposed financing arrangements.

57.     DXS and PacNet thus effectively controlled SMP, including essentially each of its significant financial and managerial decisions.

58.     Cooper's and the Lippo Group's repeated use of DXS's and PacNet's negative controls to prevent SMP from accepting financing (on its own or on CSM's behalf) was a breach of the SMP Agreement and of Cooper's, DXS's, and PacNet's fiduciary duties.  Indeed, they did not exercise those rights to further SMP's interests; instead, they did so as part of a surreptitious plan that the Lippo Group had hatched to divest SMP (and thus CC and SMI) of its membership interest in CSM and to acquire CSM's assets for themselves.

59.     As early as October 2015, Cooper had explained in an email to Noronha:

17

> Then I would at request of Noble, consider buying that
> debt at a large discount, which the [Riady] family would
> then have full security and take some upside on debt.
> **Then we can sit back and hold our position and when
> this collapses we have the first lien and can buy it out
> of bankruptcy very cheap.**

60.     The Lippo Group was motivated to develop and pursue that plan in

significant part by its assessment that it could realize more than $600 million worth

of value by divesting SMP (and thus SMI and CC) of its interest in CSM.

61.     That valuation, on information and belief, was based in part on

(a) Cooper having been told – on a confidential basis and in his capacity as a

company manager – by Newmont Mining (one of the largest mining companies in

the world) that CSM's properties included a "world class" copper porphyry deposit

based on their analyses and (b) many days on-site gathering information and

producing reports and memos, none of which was shared with other Managers or

members despite multiple requests.  During the relevant time period, Cooper failed

to disclose these material facts to SMI or CC, but shared it only with SMP's other

members (DXS and PacNet).

62.     The Lippo Group's illicit scheme reached the conglomerate's highest

levels.  The Riadys, on behalf of themselves and LCR, provided direction to

Cooper and Noronha as they executed the Lippo Group's strategy.

63.     The Lippo Group – and therefore each of Cooper, Noronha, DXS, and

PacNet, among the other Lippo entities – had and acted on a material conflict of

18

interest with SMP and its other members.  Whereas the Lippo Group wanted to disadvantage SMP and its members for its own gain, SMP and its members had an interest in maximizing their substantial equity investments, and, at a minimum, maintaining the solvency and success of their assets.

64.     Each of Cooper, DXS, and PacNet had a duty to disclose that conflict of interest to SMP, SMI and CC.  Instead, they fraudulently concealed it.

65.     They also fraudulently concealed that, in connection with the various financing proposals that they rejected, they qualified as Interested Members pursuant to Section 4.6(b) of the SMP Agreement and thus should have been excluded from considering or voting thereon.

**V.     The Lippo Group Negotiates to Usurp Plaintiffs' and SMP's Opportunity to Acquire the Noble Loan, and Instead Acquire It for Itself**

66.     In or around late 2015, the Lippo Group – including Cooper and Noronha – negotiated with Noble to acquire the Noble Loan.  The Lippo Group concealed these negotiations from SMI, CC, and SMP.

67.     During those negotiations, Noble informed the Lippo Group that it wanted to sell the Noble Loan in the near term and was willing to do so at a substantial discount to its face value.  Defendants affirmatively misrepresented to SMI, CC, and SMP that Noble would not sell the Noble Loan at a discount.

68.     The Noble Loan Agreement required Noble to secure approval to sell or assign the Noble Loan to an entity (with the exception of a sale or assignment to an "affiliate of the Lender [Noble]").  (Noble Loan Agreement §§ 9.07(b), (f).) Noble was also expressly prohibited from selling financial participations in the Noble Loan to "any of the Borrower's Affiliates or Subsidiaries" – including the Lippo Group and all of its affiliates.  (Id. § 9.07(c).)  The purpose of these restrictions, among other things, was to prevent one of SMP's members from benefiting from a default by its Subsidiary, and putting decision makers in positions with debilitating conflicts of interest against the other members of SMP.

69.     In early November 2015 – consistent with Defendants' plan – Noble informally claimed that "Events of Default" had occurred under the Noble Loan Agreement and, in connection therewith, explicitly reserved its purported right "to sell or assign" the Noble Loan to "one or more Eligible Assignees without the consent of the Company."

70.     Noble did not take any action to enforce its rights due to the alleged Event of Default (and, in fact, thereafter formally waived the alleged Event of Default).  That was consistent with the parties' prior practice, whereby they revised timetables for various steps contemplated by the Noble Loan Agreement.  As a practical matter, Noble could not pursue an Event of Default because doing so would (i) forfeit its valuable rights under the parties' Offtake Agreement, (ii)

20

further impair the value of its debt by precluding the debt-to-equity conversion of the WUMI Loan that was senior to the Noble Loan, and (iii) generally impair the marketability and value of the Noble Loan.

71.     Although Noble could not and did not pursue a default, Noble proposed that the SMP members approve execution of a document titled the "Fourth Amendment to Loan and Security Agreement" (the "Fourth Amendment"), which would amend certain terms of the Noble Loan Agreement. The Fourth Amendment confirmed that "no Default or Event of Default has occurred and is continuing as of the Fourth Amendment Effective Date."

72.     The proposed Fourth Amendment provided that Noble would be "entitled to sell and assign all or any portion of the Loan . . . without the consent of the Borrower or its Affiliates."  The Fourth Amendment was thus intentionally drafted – unbeknownst to SMI, CC, or SMP at the time – to further Defendants' plan so that, if and when it became effective, Noble would be able to close on the secret deal they already had reached to sell the Noble Loan to the Lippo Group without Plaintiffs' consent.

73.     Neither Noble nor the Lippo Group disclosed to SMI, CC, or SMP the material fact that the Fourth Amendment's terms were in furtherance of the Lippo Group's illicit plan to acquire the Noble Loan to the detriment of SMI, CC, and SMP.  To the contrary, in the face of Plaintiffs raising concerns about the proposed

21

amendment, Defendants represented that there was no plan (let alone a deal) to sell the Noble Loan to the Lippo Group, and Noble represented that it would not be selling the Noble Loan at a discount.  Both of those representations were false.  In reliance on those representations, SMI, CC, and SMP consented to the Fourth Amendment.

74.     Had the Lippo Group disclosed its plan to Plaintiffs, or had Noble disclosed the fact that it was planning (and in fact already had reached a deal) to sell the loan to the Lippo Group, Plaintiffs would not have consented to the Fourth Amendment.

## VI.     The Lippo Group Conceals Its Plan to Acquire the Noble Loan, While Continuing to Block Capital Fundraising Efforts

75.     In late 2015, Noble told SMP and others that it was interested in selling the Noble Loan in the near-term, but that it would not be willing to do so at a substantial discount to the loan's face value – contrary to what it actually had negotiated with the Lippo Group behind Plaintiffs' backs.

76.     This was nonetheless a rare and valuable opportunity for SMP.  It was uniquely positioned to acquire the Noble Loan on advantageous terms where (i) Noble was interested in selling the loan on a very compressed timeline and (ii) only SMP (or insiders thereof) could have bought the loan on such a timeline by acting on insider knowledge and information received with respect to the true

22

long-term value of the project, including reports regarding mineral deposits and prospects for the mines.

77.    SMI's appointee to each Board of Managers, David J. Richards ("Richards"), explained this opportunity to SMP's members and urged them to pursue it collectively and collaboratively.  Indeed, the parties clearly had the financial wherewithal given the over $90 million in equity investments in SMP that historically had been provided as needed.

78.    In SMP Board of Managers meetings, the parties discussed and regarded the prospect of acquiring the Noble Loan as a corporate opportunity. They discussed, for instance, potentially arranging for one of SMP's members to acquire the Noble Loan, inviting the other members to participate, and then restructuring the loan's terms in a manner that would benefit SMP and all of its members.  Plaintiffs and SMP management supported its pursuit of the opportunity, and for good reasons:  that opportunity would facilitate SMP's efforts to advance the progress of the mining project, which would have been financeable by a variety of means including existing equity holders, and be well-positioned to further drill out the properties to develop additional resources.  Plaintiffs were ready, willing, and able to make an offer to purchase the Noble Loan for the benefit of SMP and all of its members.

23

79.     During those internal discussions, the Lippo Group continued to conceal its secret plan to acquire the Noble Loan for itself (rather than SMP) and the fact that it was negotiating that very transaction behind SMI's, CC's and SMP's backs.

80.     Indeed, Cooper continued to defraud SMI, CC, and SMP and repeatedly misrepresented that he had "no knowledge" of any discussions between Lippo and Noble – despite being deeply involved therein and routinely discussing and planning the same with the Riadys and Noronha.

81.     Defendants withheld other material information from Plaintiffs, including that Noble (i) had asserted that it had a hard December 31, 2015, deadline to sell the Noble Loan and (ii) was in fact willing to sell the loan at a substantial discount.

82.     Through a series of emails and discussions in or around the timeframe of November 22-26, 2015, less than one month after Noble had reserved its rights to call a default, Noble had already conspired with the Lippo Group and entered into an agreement in principle with the Lippo Group to sell the loan to the Lippo Group for approximately $23 million (an approximate 30% discount off its $33 million face value).

83.     In December 2015, at SMP Board meetings, the Lippo Group – including Cooper specifically – fraudulently concealed from Plaintiffs that the

24

Lippo Group and Noble already had conspired and agreed on a sale of the Noble Loan, even while procuring further investments from SMI and CC.  Indeed, after reaching its secret agreement to acquire the Noble Loan from Noble, the Lippo Group fraudulently induced SMI and CC to infuse an additional $6.8 million into SMP that the Lippo Group was planning to take for itself.  In connection with that financing, Defendants advocated for a valuation of more than $2,200 per unit, leaving SMP with a more than $150 million equity valuation at the conclusion of that financing round in December 2015.  Plaintiffs would not have agreed to contribute any additional funds had Defendants disclosed (and not affirmatively misrepresented and lied about) their secret dealings with Noble or their illicit plan.

84.    In addition, consistent with their plan, the Lippo Defendants continued to interfere with SMP's efforts to finance CSM's Noble Loan obligations and SMP's efforts to acquire the loan, including by continuing to improperly exercise their blocking power.  CSM had, for instance, secured financing proposals in the form of a $4 million government-backed loan from Stonehenge Capital Company, LLC and a separate $2 million proposal from the same entity.  These were state-tax-credit sponsored, low-interest rate loans, which would have helped stabilize the company, likely would have facilitated timely completion of the Phase II facilities, and averted the company's associated financial problems.  However, DXS and PacNet – in furtherance of the Lippo

Group's secret plan – blocked both transactions, again without disclosing their self-serving purposes and their true plan to harm SMP and divest it of its assets.

85.     Likewise, Defendants deviated from the members' historical practice and blocked proposed member financings, which would have been sufficient to enable SMP, or a friendly member or entity, to acquire the Noble Loan for the benefit of all of SMP's members and to continue to support the Phase II development of the mining facilities.  Historically, SMP's members had contributed the financing necessary to support CSM's growth and development (or supported debt financing instead).  The late 2015 time period was no exception – SMP and its members were prepared to address their Subsidiary's capital requirements – but the Lippo Group prevented that.

86.     On or about December 24, 2015, Plaintiffs finally uncovered Defendants' divided loyalties and dishonest dealings when Richards was mistakenly copied on an internal Noble email, revealing that Defendants had been planning for Waterloo, a Lippo entity, to acquire the Noble Loan.

87.     On December 30, 2015, SMI and CC sent a letter to DXS, PacNet, Cooper, and Noble, stating that material information had been concealed or withheld from Plaintiffs in connection with their prior consent to the Fourth Amendment.  Plaintiffs explained that the consents were thereby void, withdrawn,

26

Case 18-50063-LSS   Doc 131   Filed 06/25/18   Page 28 of 108

and that the conditions precedent to the Fourth Amendment becoming effective had not been met.

88.     Plaintiffs further explained that they "vigorously do and will contest and oppose by all means, and do not and have not consented or approve on our own behalf or on behalf of CS Mining or SMP, of the transfer" of the Noble Loan "to a non-affiliate of Noble, including but not limited to any individual shareholders or board members of SMP or CS Mining, or affiliates or controlled or backed parties of such entities, or any other party."

## VII.    The Lippo Group Ignores SMI's, CC's and SMP's Objections and Acquires the Noble Loan Through Waterloo

89.     Rather than taking pause in the face of SMP's, SMI's and CC's objections to the Noble Loan's assignment to a Lippo entity, Defendants accelerated their plan.

90.     On December 31, 2015 – the day after Plaintiffs set forth their written objection to the conspiracy they had just uncovered through the inadvertent email, including the plan to assign the Noble Loan to the Lippo Group – the Lippo Group acquired the loan from Noble for approximately $23 million.  (Tellingly, at SMP's aforementioned December 2015 Board meetings, Plaintiffs had proposed that SMP adopt a specific corporate-opportunities policy.  In response, Cooper feigned support for the idea, but insisted that the issue be taken up in January which, as

27

planned and actually turned out, was <u>after</u> Cooper had helped the Lippo Group acquire the Noble Loan.)

91.     Over SMP's strenuous objection, Defendants breached both the SMP Agreement and the Noble Loan Agreement because they effectuated the Waterloo acquisition without approval from the SMP Board of Managers and with an impermissible assignee, where Waterloo was not an affiliate of Noble and not approved by the Loan Parties as an assignee.

92.     The Lippo Group was aware of these contractual limitations on Noble's ability to sell the Noble Loan to it.  The Lippo Group caused Noble to breach those obligations in furtherance of the Lippo Group's interest in acquiring the debt and exploiting its conflicting positions as SMP member and creditor.

93.     In addition, the Lippo Group unlawfully acquired the Noble Loan by using confidential information in violation of numerous restrictions that precluded the Lippo Group from doing so.  The Lippo Group's violation of those restrictions enabled it to develop an offer for the Noble Loan, freeze SMP (and SMP's friendly members) out of that corporate opportunity, and negotiate a favorable secret deal at SMP's, SMI's and CC's expense.

## VIII. The Lippo Group Leverages Its Control Over SMP, Starves SMP of Funds, Divests It of Its Assets, and Acquires Them at an Enormous Discount

94.     After acquiring the Noble Loan through Waterloo, the Lippo Group continued to starve SMP of funds.  The Lippo Group acted on its debilitating conflict of interest to cause its agents (including Company management) to take harmful actions which were not approved by SMP's Board, including substantial staff reductions, directing payments to specific vendors, suggested modifications to equipment loans, and material changes to operational plans – all designed to further its purpose of depressing the value and financial abilities of SMP and perceived value of CSM.

95.     Indeed, at the time, SMP was in the midst of restructuring CSM's financial operations and debts – including the Noble Loan – to position CSM to meet its debt obligations, to have sufficient runway to complete the Phase II construction, and to undertake a $10 million equity raise.  That included, for example, having productive discussions with CSM's creditors to restructure its debt and otherwise defer payment to ensure its financial stability.

96.     The Lippo Group, however, prevented that from happening or otherwise securing additional liquidity.  The Lippo Group's acquisition of the Noble Loan also substantially impaired SMP's ability to obtain additional

29

financing in the market due to the market's knowledge of the Lippo Group's broad

control and leverage over SMP.

97.     In addition, in March and May 2016, SMI and CC proposed that the

SMP members invest $20 million that could be used by SMP to stabilize CSM's

operations and avoid insolvency, subject to a marginal adjustment in amortization

of the Noble Loan.  Consistent with its plan, however, the Lippo Group rejected

that capital raise.  Had the Lippo Group been interested in simply having the Noble

Loan paid off (as a non-conflicted lender would have been), it would have agreed

to Plaintiffs' proposed modification.  But the Lippo Group was not like a typical

lender; it had placed itself in a uniquely conflicted position, and was acting on

severe, debilitating conflicts of interest, abusing its insider status to advance its

own interests at the expense of SMP, SMI, and CC.

98.     Indeed, the Lippo Group continued to manipulate SMP in furtherance

of its scheme.  For example, Cooper and Noronha instructed SMP management to

cause CSM to draw down the full principal amount of the Noble Loan and caused

CSM to undertake a $5 million high-interest-rate loan.  Cooper and Noronha were

on site while this multi-tranche facility was negotiated and portions were

advanced.  As advances were made, they directed SMP management how to spend

the funds to advance their self-interested goal (as admitted to SMP's CEO) to

30

reduce payables for each vendor supporting the Phase II project to less than
$200,000.

99.    Their purpose in doing so was not to further SMP's or its members'
interests.  Rather, by directing payments in that manner (at the expense of taking
on a high-interest loan and securing a guaranty from SMP ultimately used by
Lippo Group in its plan) and causing CSM to draw down on the Noble Loan,
Lippo Group was attempting to cause the satisfaction of a "Project Completion
Date" provision in the intercreditor agreement between WUMI and Noble, in an
attempt to (i) trigger a mandatory conversion of that senior debt into equity of
SMP, (ii) advance the seniority of the Lippo Group's secured creditor position
(through the Noble Loan), and (iii) better position the Lippo Group to acquire
CSM's assets for itself in bankruptcy and, at the same time, divest SMP of its
interest in the same.

100.    In June 2016, consistent with the Lippo Group's longstanding plans,
an involuntary bankruptcy petition was brought against CSM, and in August 2017,
the bankruptcy case proceeded to sale.  Bidding on the assets reflected the reality
that Defendants' actions had caused:  the considerable delay in the completion of
Phase II operations caused a domino effect which led to the bankruptcy, and the
Lippo Group (an SMP member) held a secured creditor position.  Thus, Tamra
Mining Company, LLC ("Tamra") – a Lippo affiliate – won the bidding and

31

acquired all of CSM's assets for approximately $40 million.  The Lippo Group had thus successfully divested SMP of its interest in CSM's assets and extinguished the value of SMI's and CC's significant equity value and investments in SMP.

## IX.    Demand Is Futile

101.    Plaintiffs SMI and CC bring the single derivative causes of action in this Complaint for the benefit of SMP to redress the injuries suffered, and to be suffered, by SMP as a result of Defendants' wrongdoing.

102.    Plaintiffs SMI and CC were members of SMP during Defendants' wrongful course of conduct and continue to be members as of the date of this Complaint.

103.    Despite Plaintiffs' insistence that Defendants fulfill their legal obligations to Plaintiffs, Defendants have failed to rectify the wrongs described in this Complaint because Defendants suffer from conflicts of interest and divided loyalties, which expose them to a substantial likelihood of being liable for their wrongdoing but also preclude them from exercising their independent business judgment on these matters.

104.    Pursuant to Section 4.6(b) of the SMP Operating Agreement, DXS has a blocking right with respect to the "commencement or settlement of any claim, demand or litigation resulting in projected costs and expenses or benefits in an amount greater than $3,000,000, or which is otherwise material in the context of

32

the business of Skye or any subsidiary." Demand is thus futile because DXS,

which stands to be liable for its disloyal conduct and in connection with the claims

herein, would not permit SMP to bring these claims against it and the other Lippo

affiliates.

**FIRST CAUSE OF ACTION**
**Fraud**
**Defendants Cooper, Noronha, PacNet, and DXS**
**(Direct on Behalf of SMI and CC)**

105. Plaintiffs reallege the foregoing allegations.

106. Cooper, Noronha, PacNet, and DXS made intentional

misrepresentations to SMI and CC of material fact and intentionally omitted

material facts regarding their plan for the Lippo Group to acquire the Noble Loan,

including as to (i) Noble's willingness to sell the loan at a substantial discount;

(ii) their negotiations and agreement with Noble to acquire the Noble Loan through

Waterloo; (iii) the preparation of the Fourth Amendment to the Noble Loan

Agreement in furtherance of their plan to acquire the loan through Waterloo;

(iv) their plan to attempt to convert the WUMI Loan solely in order to enhance

their creditor position; and (v) their plan to depress the value of SMP interests by

acquiring its assets for themselves at a substantial discount.

107. SMI and CC justifiably relied on those misrepresentations. These

Defendants went to great lengths to conceal their plan to harm SMI and CC, and

the success of their plan, in significant part, depended on that concealment. Had

33

Plaintiffs known of these Defendants' ulterior motives, Plaintiffs would not have continued to contribute funds to SMP and would have acted to prevent these Defendants' from executing their plan.

108. These Defendants' misrepresentations and omissions were intentional. Cooper, Noronha, PacNet, and DXS intended for SMI and CC to remain ignorant of the Lippo Group's secret dealings and illicit plan.

109. As a direct and proximate result of Cooper's, Noronha's, DXS's, and PacNet's fraud, SMI and CC have suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Breach of § 5.1(l)(ii) of the SMP Agreement
### Defendants DXS and Noronha
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

110. Plaintiffs reallege the foregoing allegations.

111. Defendant DXS is a party to the SMP Agreement with CC and SMI.

112. CC and SMI have performed their obligations under the SMP Agreement.

113. On information and belief, in the course of their efforts to divert the opportunity to purchase the Noble Loan away from SMP, Defendants DXS and Noronha breached § 5.1(l)(ii) of the SMP Agreement by failing to hold information obtained in connection with that agreement in confidence and trust, and by revealing such information to the Lippo Group.

34

114.    On information and belief, for example, Defendant Noronha revealed confidential information that he obtained in his capacity as a DXS Representative to Waterloo and/or its affiliates or parents, in order to assist the Lippo Group and to enable Waterloo to unlawfully acquire the Noble Loan.

115.    The breach of Section 5.1(l)(ii) of the SMP Agreement by DXS and Noronha harmed SMP, SMI, and CC, including by enabling the Lippo Group to acquire the Noble Loan where it would not have otherwise been able to do so on the terms and timeline demanded by Noble.

116.    As a direct and proximate result of Defendants DXS's and Noronha's breach of the SMP Agreement, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**Defendants DXS and PacNet**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

117.    Plaintiffs reallege the foregoing allegations.

118.    DXS and PacNet had an implied covenant to exercise their blocking rights under the SMP Agreement in good faith.

119.    DXS and PacNet breached that duty by, among other things, exercising their blocking rights for the purpose of starving SMP of timely capital on reasonable terms in furtherance of the Lippo Group's concealed plan to depress

35

the value of SMP and its interests and acquire for itself the mining assets at a

substantial discount so that SMP, SMI, and CC were eliminated from the picture.

120.   As a direct and proximate result of DXS's and PacNet's actions, SMP,

SMI, and CC have suffered damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Tortious Interference with Contract**
**Defendants Cooper, Noronha, Waterloo, and LCR**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

121.   Plaintiffs reallege the foregoing allegations.

122.   Defendants Cooper, Noronha, Waterloo, and LCR were aware of DXS

and PacNet's obligations under the SMP Agreement.

123.   In furtherance of the Lippo Group's illicit plan to extinguish SMI's

and CC's equity value, divest SMP of its assets, and acquire those assets for

themselves, Defendants Cooper, Noronha, Waterloo, and LCR caused DXS and

PacNet to breach its obligations under the SMP Agreement, including Sections

4.6(b) and 5.1(l)(ii) of the SMP Agreement.

124.   By causing DXS and PacNet to breach the SMP Agreement, these

Defendants tortuously interfered with those contracts.

125.   As a direct and proximate result of that tortious interference, SMP,

SMI, and CC have suffered damages in an amount to be determined at trial.

36

## FIFTH CAUSE OF ACTION
### Breach of § 3.5 of the SMP Agreement
### Defendants DXS and PacNet
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

126.    Plaintiffs reallege the foregoing allegations.

127.    Defendant DXS and PacNet are parties to the SMP Agreement with
Plaintiffs CC and SMI.

128.    CC and SMI have performed their obligations under the SMP
Agreement.

129.    Under Section 3.5 of the SMP Agreement, Board of Managers
authorization was required for a member to possess a loan made to SMP and, even
where such a loan was authorized, the other members were entitled to participate
on a pro rata basis.

130.    Waterloo, an affiliate of DXS and PacNet, was thus prohibited from
acquiring the Noble Loan without SMP's authorization.

131.    SMP did not authorize Waterloo's acquisition of the Noble Loan and,
in fact, objected to it.

132.    DXS and PacNet thus breached Section 3.5 of the SMP Agreement by
assisting their affiliate, Waterloo, acquire the Noble Loan.

133.    As a direct and proximate result of that breach of the SMP
Agreement, SMP, CC, and SMI have suffered damages in an amount to be
determined at trial.

37

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### Defendant Cooper
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

134.   Plaintiffs reallege the foregoing allegations.

135.   Defendant Cooper is (and at all times relevant was) a Manager and Chairman of SMP, and owes (and at all times relevant owed) fiduciary duties – including the duties of due care, loyalty, and candor – to SMP and each of its members, including SMI and CC, under common law and Section 5.1(g) of the SMP Agreement.

136.   Because SMP is effectively the sole owner of CSM, Cooper had a responsibility when acting on behalf of CSM to act for the sole benefit of SMP.

137.   Cooper acted in bad faith and breached his fiduciary duty of loyalty to SMP, SMI, and CC, including by:

- Placing his own and the Lippo Group's interests, to control and own SMP's assets, above the interests of SMP, SMI, and CC;

- Concealing his and the Lippo Group's conflict of interest with that of SMP and its other members;

- Concealing material information from SMP, SMI, and CC relating to the anticipated purchase of the Noble Loan by the Lippo-affiliate, Waterloo;

- Causing and assisting the Lippo-affiliate Waterloo to acquire the Noble Loan at a substantial discount – including through the use of confidential information – and thereby acting in the interests of the Lippo Group rather than SMP;

38

- Covertly and unlawfully diverting a corporate opportunity belonging to SMP and its members to Waterloo; and

- Concealing material information from SMP, SMI, and CC regarding the Lippo Group's interest in extinguishing the value of SMP, divesting it of its core assets and interest in CSM, and acquiring CSM's assets for the sole benefit of the Lippo Group.

138.    Cooper's self-dealing and deliberate disregard for the interests of those to whom Cooper owed fiduciary duties amount to a breach of his duty of loyalty.

139.    As a direct and proximate result of Cooper's bad faith and breach of his fiduciary duties, SMI, CC, and SMP have suffered damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Breach of Fiduciary Duties
### Defendants DXS and PacNet
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

140.    Plaintiffs reallege the foregoing allegations.

141.    DXS and PacNet, acting individually and in concert, exercised actual control over SMP, including through the exercise of their powers under the SMP Agreement.

142.    In exercising such control of SMP, DXS and PacNet owed fiduciary duties to SMP and its members, including the duties of care, loyalty, and candor.

143.    DXS and PacNet breached their fiduciary duties to SMP, including by:

- Placing their own and the Lippo Group's interests, to control and own CSM or its assets, above the interests of SMP, SMI, and CC;

- Using their blocking rights to starve SMP of capital, in furtherance of the Lippo Group's interests and to SMP's and its members' detriment;

- Concealing material information from SMP, SMI, and CC relating to the anticipated purchase of the Noble Loan by the Lippo-affiliate Waterloo;

- Causing and assisting the Lippo-affiliate Waterloo, to acquire the Noble Loan at a substantial discount – including by using confidential Company information – and thereby acting in the interests of the Lippo Group rather than the interests of SMP and its members;

- Covertly and unlawfully diverting to Waterloo a corporate opportunity belonging to SMP and its members; and

- Concealing material information from SMP, SMI, and CC regarding the Lippo Group's interest in in extinguishing the value of SMP, divesting it of its core assets and interest in CSM, and acquiring CSM's assets for the sole benefit of the Lippo Group.

144. DXS and PacNet's self-dealing and deliberate disregard of the interests of those to whom they owed fiduciary duties constitute a breach of those duties.

145. As a direct and proximate result of DXS's and PacNet's bad faith and breach of fiduciary duties, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

40

## EIGHTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### Defendants DXS and PacNet
### (in the alternative to Seventh Cause of Action)
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

146.    Plaintiffs reallege the foregoing allegations.

147.    Defendant Cooper owed fiduciary duties to SMP and Plaintiffs.

148.    Defendants DXS and PacNet knew that Defendant owed fiduciary duties to SMP and Plaintiffs.

149.    As part of the Lippo Group's self-serving plan, DXS and PacNet nevertheless furthered and knowingly participated in the breaches of fiduciary duties committed by Cooper.

150.    As a direct and proximate result of DXS and PacNet having aided and abetted Cooper's breach of his fiduciary duties, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### Defendants Noronha, Waterloo, Michael Riady, Stephen Riady,
### LCR, and Noble
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

151.    Plaintiffs reallege the foregoing allegations.

152.    Defendants Cooper, DXS, and PacNet owed fiduciary duties to SMP.

41

153.    Defendants Noronha, Waterloo, Michael Riady, Stephen Riady, LCR, and Noble knew that Defendants Cooper, DXS, and PacNet owed fiduciary duties to SMP and Plaintiffs.

154.    As part of the Lippo Group's self-serving plan, these Defendants nevertheless furthered and participated in the breaches of fiduciary duties committed by Cooper, DXS, and PacNet.

155.    As a direct and proximate result of these Defendants having aided and abetted Cooper's, DXS's, and PacNet's bad faith and breach of fiduciary duties, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### Civil Conspiracy
**Defendants Cooper, Noronha, DXS, PacNet, Waterloo, Michael Riady, Stephen Riady, and LCR**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

156.    Plaintiffs reallege the foregoing allegations.

157.    Defendants Cooper, Noronha, DXS, PacNet, Waterloo, Michael Riady, Stephen Riady, and LCR constitute a combination of two or more persons.

158.    These Defendants had a meeting of the minds on a course of action, the object of which was, among other things, to divert a corporate opportunity from SMP, rush through the unlawful assignment of the Noble Loan to Waterloo, facilitate the issuance of Noble's December 30, 2015, reservation of rights and notice of default, and divest SMP of its assets (while acquiring those assets for the

42

sole benefit of the Lippo Group), with the net effect of eliminating SMP, SMI, and CC from the picture.

159.    In furtherance of their conspiracy, these Defendants undertook overt, unlawful acts, including but not limited to violations of fiduciary duties, breaches of contractual obligations, and interference with economic relations as set forth in this Complaint.

160.    As a direct and proximate result of these Defendants' conspiracy, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
**Tortious Interference with the Noble Loan Agreement
Defendants DXS, PacNet, Cooper, Noronha, Waterloo, Michael Riady,
Stephen Riady, and LCR
(Derivative on Behalf of SMP)**

161.    Plaintiffs reallege the foregoing allegations.

162.    Defendants DXS, PacNet, Cooper, Noronha, Waterloo, Michael Riady, Stephen Riady, and LCR were aware of the Noble Loan Agreement.

163.    These Defendants were also aware that SMP was a Loan Party to, and an intended beneficiary of, the Noble Loan Agreement.

164.    By facilitating the sale of the Noble Loan to Waterloo, which is neither an affiliate of Noble nor an assignee approved by SMP or its members, and which is affiliated with a member of SMP, these Defendants caused Noble to breach §§ 9.07(f) and (c) of the Noble Loan Agreement.

43

165.   In addition, these Defendants caused Noble to breach the requirements in §§ 9.07(b) and (c) requiring Noble to provide prior notice of any transfer of the Noble Loan.

166.   By causing Noble to breach the Noble Loan Agreement, these Defendants tortuously interfered with that contract to SMP's detriment.

167.   As a direct and proximate result of that tortious interference, SMP has suffered damages in an amount to be determined at trial.

<u>TWELFTH CAUSE OF ACTION</u><br><b>Breach of the Noble Loan Agreement<br>Defendant Noble<br>(Derivative on Behalf of SMP)</b>

168.   Plaintiffs reallege the foregoing allegations.

169.   SMP was a Loan Party to, and an intended beneficiary of, the Noble Loan Agreement.

170.   SMP and CSM performed their obligations under the Noble Loan Agreement.

171.   The Noble Loan Agreement prohibited Noble from selling or transferring the Noble Loan without prior notice or approval, or to an impermissible assignee.

172.   In breach of the Noble Loan Agreement, Noble agreed to sell the Noble Loan to Waterloo without prior notice and without approval, and to an impermissible assignee in Waterloo.

44

173.   As a direct and proximate result of Noble's breach of the Noble Loan Agreement, SMP has suffered damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Defendant Noble
### (Derivative on Behalf of SMP)

174.   Plaintiffs reallege the foregoing allegations.

175.   SMP was a Loan Party to, and an intended beneficiary of, the Noble Loan Agreement.

176.   SMP and CSM performed their obligations under the Noble Loan Agreement.

177.   In connection with the Noble Loan Agreement, Noble had an implied covenant to provide notice of any intended sale of the Noble Loan in good faith.

178.   Noble breached that duty by concealing its agreement to sell the Noble Loan to Waterloo until the day before it was effectuated, thereby preventing the parties from acting to prevent the sale and depriving SMP and its members of the benefit of the notice requirement in Section 9.07(b) of the Noble Loan Agreement.

179.   As a direct and proximate result of Noble's breach of its duty of good faith and fair dealing, SMP has suffered damages in an amount to be determined at trial.

RLF1 18989228v.1

# FOURTEENTH CAUSE OF ACTION
## Fraud
## Defendant Noble
## (in the alternative to the Twelfth Cause of Action)
## (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

180.   Plaintiffs reallege the foregoing allegations.

181.   Noble made intentional misrepresentations to Plaintiffs and SMP of material fact and intentionally omitted material facts regarding its plan and agreement to transfer the Noble Loan to the Lippo Group including as to (i) Noble's willingness to sell the loan at a substantial discount; (ii) its negotiations and agreement with the Lippo Group to sell the Noble Loan through Waterloo; and (iii) the preparation of the Fourth Amendment to the Noble Loan Agreement in furtherance of its plan to sell the loan to the Lippo Group.

182.   SMP, SMI, and CC justifiably relied on those misrepresentations. Noble went to great lengths to conceal its plan to sell the Noble Loan to the Lippo Group and the terms on which it intended to do so.  Had SMP, SMI, and CC known about Noble's plan and agreement to sell the Noble Loan to the Lippo Group, they would not have authorized consents to the Fourth Amendment.

183.   These Defendants' misrepresentations and omissions were intentional. Cooper, Noronha, PacNet, and DXS intended for SMP, SMI, and CC to remain ignorant of the Lippo Group's secret dealings and illicit plan.

46

184.   As a direct and proximate result of Cooper's, Noronha's, DXS's, and PacNet's fraud, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and derivatively on behalf of SMP, respectfully request the entry of a judgment:

1.   Awarding to SMI, CC, and SMP damages in an amount to be proven at trial;

2.   Awarding to SMI, CC, and SMP all costs and fees incurred in connection with this action, including reasonable attorneys' fees; and

3.   Awarding all such other and further relief as the Court deems appropriate.

*/s/ Russell C. Silberglied*

Russell C. Silberglied (#3462)

Rudolf Koch (#4947)

Kevin M. Gallagher (#5337)

Anthony M. Calvano (#6265)

RICHARDS, LAYTON & FINGER, P.A.

One Rodney Square

920 North King Street

Wilmington, DE 19801

(302) 651-7700

OF COUNSEL:

Jason C. Cyrulnik
Edward J. Normand
Marc Ayala
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, New York 10504
(914) 749-8200

*Counsel for Plaintiffs Skye Mineral Investors, LLC and Clarity Copper, LLC*

Christopher Grivakes, CA Bar No. 127994
Damion Robinson, CA Bar No. 262573
AFFELD GRIVAKES LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 979-8700
Email: cg@agzlaw.com
*Admitted Pro Hac Vice*

Dated: March 11, 2018

48

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT**
~~OF CHANCERY OF~~ FOR THE ~~STATE~~ DISTRICT OF DELAWARE

| | |
|---|---|
| SKYE MINERAL INVESTORS, LLC and CLARITY COPPER, LLC, directly and derivatively on behalf of SKYE MINERAL PARTNERS, LLC, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ~~C.A.~~ Misc. Pro. No. ~~2018-~~ ) ~~____ ____~~ 18-00101 (LSS) |
| DXS CAPITAL (U.S.) LIMITED, PACNET CAPITAL (U.S.) LIMITED, MARSHALL COOPER, SANJIV NORONHA, WATERLOO STREET LIMITED, LIPPO CHINA RESOURCES LTD.~~,~~, MICHAEL RIADY, STEPHEN RIADY, ~~TAMRA MINING COMPANY, LLC,~~ and NOBLE AMERICAS CORP., | ) ) ) ) [Case No. 2018-0059-JRS, ) Delaware Court of Chancery] ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| SKYE MINERAL PARTNERS LLC, | ) ) |
| Nominal Defendant. | ) |

**VERIFIED AMENDED COMPLAINT**

Plaintiffs, Skye Mineral Investors, LLC ("SMI") and Clarity Copper, LLC

("CC"), individually and derivatively on behalf of Skye Mineral Partners, LLC

("SMP"), by their attorneys, for their Verified Amended Complaint against

Defendants~~,~~, DXS Capital (U.S.) Limited ("DXS"), PacNet Capital (U.S.) Limited

("PacNet"), Marshall Cooper, Sanjiv Noronha, Waterloo Street Limited

("Waterloo"), Lippo China Resources Ltd. ("LCR"), Michael Riady, and Stephen

Riady, and Tamra Mining Company, LLC ("Tamra," and, (together with DXS,

PacNet, Cooper, Noronha, Waterloo, LCR, and Michael Riady, and Stephen Riady,

the "Lippo GroupDefendants" and together with their other agents and affiliates,

the "Lippo Group" or "Lippo"), and Noble Americas Corp. ("Noble"), hereby

allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.    This case concerns the Lippo Group's illicit and successful plot to

(i) extract millions of dollars from Plaintiffs in the form of equity contributions In

this case, SMI and CC seek to redress the harm they suffered and SMP suffered as

a result of Defendants' misconduct as part of an illicit scheme to benefit

themselves at the expense of SMI, CC, and SMP.  The Lippo Defendants

fraudulently induced SMI and CC to contribute millions of dollars to the parties'

joint venture, SMP and its subsidiary CS Mining, LLC ("CSM") (together with

SMP, the "Company"); (ii) force the Company into dire financial straits, (iii).  The

Lippo Defendants coupled those actions with a campaign of impermissible

activities designed to destroy the value of SMI's and CC's equity investments,

including by utilizing confidential information to secretly and fraudulently acquire

the debt secured by a significant portion of the Company's assetsalmost all of the

assets of SMP's subsidiary, and (iv) use CS Mining, LLC ("CSM" or the

2

"Subsidiary"), and using the toxic combination of ~~its~~ their newly acquired status of senior secured noteholder and ~~its~~ existing powers as SMP's manager/controller ~~of the Company~~ to extinguish their partners' equity investments and ~~acquire all of the Company's assets through bankruptcy at a fraction of their actual value.~~ divest SMP of its membership interest in the Subsidiary.

2.      ~~CSM is in the business of mining and processing copper, gold, silver and other minerals in Milford, Utah.  SMP effectively wholly-owns CSM, and served as its managing and majority member.  SMP in turn~~ SMP has four members:  Plaintiff SMI, Plaintiff CC, Defendant DXS, and Defendant PacNet.  At all relevant times, virtually all of SMP's assets consisted of its membership interest in CSM, which is in the business of mining and processing copper, gold, silver and other minerals in Milford, Utah.  ~~Thus~~SMP effectively wholly-owns and is the majority member of ~~any harm to CSM directly harmed SMP and Plaintiffs.~~ CSM.

3.      Defendants' illicit scheme harmed SMI and CC directly in several ways, causing them to lose the value of their investments.  The multiple direct causes of action set forth below seek to redress that harm.  Defendants' misconduct also harmed SMP, including by divesting SMP of its membership interests in its Subsidiary, which harm SMI and CC are seeking to redress through the (single) derivative causes of action asserted in this complaint.

3

4.      Defendants' misconduct also may have harmed other parties, including CSM, but Plaintiffs are not asserting claims to recover for the harm suffered exclusively by those other parties.  This complaint does not assert any legal claims that CSM (SMP's subsidiary) ever owned itself.  Those claims were property of CSM, a non-party to this lawsuit, which subsequently disposed of its assets through a bankruptcy proceeding.

5.      3.The Lippo Group consists of a global network of entities primarily owned and operated by, and primarily for the benefit of, the Riady family – a multi-billion dollar family based in Indonesia with broad business dealings around the world, including in real estate, mining, telecom, infrastructure, healthcare, and technology, and with a prior track record of illicit dealings.

6.      4.During the relevant period, the Lippo Group effectively controlled SMP's and (through SMP) CSM's its Subsidiary's operations, and it acted through its network of associates, agents, and affiliate entities, including DXS, PacNet, Noronha, and Cooper, the latter of whom served as a Manager and Chairman of the Board for the Company SMP (and separately for its Subsidiary) and as DXS's and PacNet's agent.

7.      5.DXS, for instance, possessed negative control rights under SMP's Operating Agreement, through which it could (and did) prevent potential funding transactions for the Company, among many other fundamental Company decisions

4

and operational activities.  Through those powers, DXS exercised effective control over ~~the Company's~~ SMP's financial condition, including by dictating the terms of any ~~Company~~ financing transactions and/or preventing ~~the Company~~ SMP or its Subsidiary from consummating potential financing transactions.

8.    ~~6.~~The Lippo Group secretly hatched a plan to exploit ~~its control over the Company to depress the Company's value and slow its progress to set it up for default, on which the Lippo Group could then capitalize~~ this control over SMP to depress the value of SMP and its assets and slow their progress, with the goal of capitalizing on those conditions.  The Lippo Group then furthered its secret plan by secretly and fraudulently ~~acquiring~~ entering into an agreement to acquire the debt secured by ~~the Company's assets~~CSM's assets and misrepresenting to SMI, CC, and SMP that it had not done so and had no intention of doing so.  The Lippo Group concealed from Plaintiffs its plan to exploit its negative and total operational control for its own benefit and to ~~the Company's~~ SMI's, CC's, and SMP's detriment.

9.    ~~7.~~In particular, the Lippo Group ~~planned~~ executed on a covert plan to (i) use its control in bad faith to starve ~~the Company for cash and cause CSM~~ SMP for cash, which funds SMP needed to fund business operations of its Subsidiary, and thereby cause the Subsidiary to default on a loan held by a senior creditor (the "Noble Loan"); (ii) collude with Noble, the lender on the Noble Loan, to defraud

5

Plaintiffs and SMP into ~~amending~~ agreeing to approve an amendment of the terms of the Noble Loan to eliminate the critical protection that precluded Noble from selling the loan without ~~the Company's~~ authorization; (iii) secretly purchase the Noble Loan in order to acquire for itself senior secured creditor status over SMP's assets; ~~(iv) induce~~ iv) induce continued equity investment by Plaintiffs throughout the course of the scheme while secretly ~~steering the Company towards a bankruptcy; (v) abuse~~ plotting to drive down the value of that equity to zero; (v) abuse its control over SMP, together with its newly acquired leverage over ~~the Company~~ SMP and its Subsidiary as a senior secured creditor through the Noble Loan, ~~in an attempt to trigger a debt-to-equity conversion of CSM's other material debt (the "WUMI Loan"), in order to~~ to further enhance its creditor position relative to other lenders; and (vi) starve ~~the Company~~ SMP of capital until ~~CSM was forced into bankruptcy, where~~ the Lippo Group could use its senior creditor position to acquire CSM's ~~assets for pennies on the dollar and thereby squeeze out Plaintiffs and take~~ core assets and divest SMP of its interest therein, thereby squeezing out SMP (and thus SMI and CC), and keeping the tens of millions of dollars ~~they~~ that SMI and CC had already invested to develop the ~~Company's~~ mining assets and the hundreds of millions in value that ~~Plaintiffs'~~ SMP's, SMI's and, CC's equity represented.

6

10.    8.The Lippo Group internally (including the Board of LCR) had "conservatively" estimated that the Company value of the assets it would acquire was worth at least $600 million at the time it perpetrated its secret scheme based on confidential information received by Cooper which he had not shared with the other Company Board members, and their scheme represented an opportunity to secure extremely valuable assets for a fraction of their value.

11.    9.The entities and individuals within the Lippo Group thus acted on material conflicts of interest and acted in favor of the Lippo Group's Defendant's interest in acquiring CSM and its assets for a massive discount in bankruptcy, at the expense of SMP's and its other members' interest in growing CSM the value of their equity and their assets, and, at the very least, maintaining its their solvency and furthering its their success.

12.    10.In 2015, the Lippo Group began to implement the initial stages of its plan by preventing the Company SMP from consummating favorable financing transactions.

13.    11.The Lippo Group also secretly was negotiating – using the Company's misusing confidential information that was the Lippo entities had obtained through the Lippo entities' and agents' Board and member capacities – with Noble to acquire the Noble Loan.

7

14.   ~~12.~~But the Lippo Group's willingness to negotiate against ~~the Company~~ SMP, SMI, and CC, and to do so behind ~~the Company's back~~ their backs was not enough:  Lippo and Noble desired to get SMP, SMI, and CC to change the terms of the Noble Loan in order to execute the illicit plan.  That is because the Noble Loan Agreement prohibited Noble from selling the Noble Loan and associated equity warrants to a non-affiliate of Noble, such as the Lippo Group ~~without CSM's (and thus SMP's) permission, unless CSM had defaulted on the loan~~.

15.   ~~13.~~Knowing that ~~the Company~~ SMI, CC, and SMP would not ~~authorize~~ sign-off on authorizing Noble to sell the loan to the Lippo Group because of the severe conflicts of interest that it would create, the Lippo ~~Group~~ Defendants executed the next stage of ~~its~~ their plan.  In late 2015, ~~the Lippo Group~~ they conspired with Noble to fraudulently induce Plaintiffs and SMP to amend the Noble Loan Agreement to eliminate the ~~requirement that the Company approve a~~ provision that prohibits the sale of the Noble Loan to a non-affiliate of Noble.

16.   ~~14.~~The Lippo Group's greed did not end there.  After reaching the secret agreement to acquire the Noble Loan from Noble, the Lippo Group fraudulently induced ~~Plaintiffs to infuse~~ SMI and CC to invest an additional $6.8 million ~~into CSM~~ that the Lippo Group was planning to take for itself shortly thereafter.  All the while, the Lippo Group represented to ~~Plaintiffs~~ SMI, CC, and

8

SMP that there were no secret dealings with Noble – knowing that Plaintiffs never would have invested any funds if the Lippo Group ~~suddenly owned~~ had planned (or as it turned out already had agreed) to acquire the Noble Loan for itself.

17.    ~~15.All of this had been~~ Defendants concealed all of this from ~~Plaintiffs~~ SMI, CC, and SMP until, in late December 2015, ~~Defendants mistakenly copied~~ Plaintiffs were accidentally copied on an email that revealed part of ~~their~~ Defendants' self-serving plans.  Deeply alarmed, ~~Plaintiffs~~ SMI, CC, and SMP promptly and vehemently objected to the sale on December 30, 2015.  Defendants ignored Plaintiffs' objections, and the Lippo Group, through Waterloo, closed on its acquisition of the Noble Loan the next day.

18.    ~~16.Having secured the Noble Loan (and a secured creditor position), the Lippo Group then moved on to executing the remaining steps of its plan.  It abused its control over SMP (and thus CSM) in an attempt to trigger a debt-to-equity conversion of the WUMI Loan, thereby enhancing its own creditor position. It then~~ The Lippo Group acted to improve its position as creditor and continued to starve ~~the Company~~ SMP for capital, including by unreasonably blocking, or refusing to consider or engage with respect to, favorable and much-needed financing transactions.

19.    ~~17.~~Unfortunately for Plaintiffs and SMP, the Lippo Group's plan worked.  SMP was divested of its equity interest in CSM when CSM was forced

9

into bankruptcy in June 2016, and the ~~bankruptcy case proceeded to sale in August 2017.  The~~ Lippo Group (through yet another affiliate) acquired all of CSM's assets[1] for approximately $40 million~~—~~.  That figure was less than 10% of its internal, "conservative" $600 million valuation ~~of the Company~~, less than 43% of the approximately $93.7 million cash equity funds SMP's equity holders had invested in SMP, and less than 28% of the $144.5 ~~milion~~ million cash funds invested in SMP and the CSM mining project.

20.     ~~18.~~All of Plaintiffs' investments in ~~the Company~~ SMP – including their $6.8 million December 2015 investment which, unbeknownst to Plaintiffs, actually had post-dated Lippo's secret deal with Noble – and their longstanding equity shares therein were extinguised~~,~~.  SMI and ~~Plaintiffs~~ CC were left with nothing.

21.     ~~19.~~Having acquired the assets for itself, the Lippo Group proceeded to enjoy a windfall benefit from its breaches of its fiduciary duties, its contractual obligations, and its common law obligations, in addition to Noble's breaches of its obligations, which furthered the Lippo Group's illicit scheme.

---

[1] This action does not challenge the bankruptcy sale process itself, which was conducted in the wake of the destruction in value that Defendants' actions had caused.

10

## LACK OF JURISDICTION

22.    This Court lacks either core or non-core jurisdiction.  Plaintiffs have only filed this amended complaint in this Court because Defendants improperly removed it to this Court.  A motion to remand is pending.  Plaintiffs do not consent to adjudication in this Court.

## THE PARTIES

23.    20.Plaintiff SMI is an Ohio limited liability company and is a member of SMP.

24.    21.Plaintiff CC is a Delaware limited liability company and is a member of SMP.  Plaintiffs SMI and CC together represent two-thirds of the managers on the Board of Managers for each of SMP and CSM and approximately 71.94% of the Class A equity ownership of SMP and approximately 69.11% of the fully diluted equity.

25.    22.Defendant DXS is a Delaware corporation and a member of SMP.  On information and belief, Lippo China Resources Limited ("LCR"), a multi-billion dollar conglomerate, owns and controls DXS, and at all relevant times DXS acted on LCR's behalf or at LCR's direction.

26.    23.Defendant PacNet is a Delaware corporation and a member of SMP.  LCR, on information and belief, owns and controls PacNet, and at all relevant times PacNet acted on LCR's behalf or at LCR's direction.

11

27. 24. Defendant LCR is an entity that owns and controls DXS and PacNet and, on information and belief, is owned and controlled by the Riady family, and/or its affiliates and controlled parties. The actions of Defendants Cooper, Noronha, DXS, PacNet, and Waterloo, as described herein, were taken on LCR's behalf or at LCR's direction.

28. 25. Defendant Marshall Cooper is an individual residing in Jakarta, Indonesia. DXS and PacNet appointed Cooper, as their agent, to the Board of Managers of both SMP and CS Mining.

29. 26. Defendant Sanjiv Noronha is an individual residing in Singapore. On information and belief, Noronha is affiliated with LCR. DXS designated Noronha as the "DXS Representative" at SMP, pursuant to DXS's rights under the SMP operating agreement.

30. 27. Defendant Michael Riady is an individual residing in Florida. He is a grandson of Mochtar Riady, the patriarch of the Riady family, and has been at all relevant times a lead representative for the Riady family (and thus the Lippo Group) since its investment in SMP.

31. 28. Defendant Stephen Riady is an individual residing, on information in belief, in Singapore. He is a grandson of Mochtar Riady, the patriarch of the Riady family, and has been at all relevant times directly involved in the Riady

12

family's Company-related activities (and thus the Lippo Group's activities) since its investment in SMP.

32.    ~~29.~~Defendant Waterloo is a British Virgin Islands company.  LCR, on information and belief, owns and controls Waterloo.

~~30.    Defendant Tamra is a Delaware limited liability company.  LCR, on information and belief, owns and controls Tamra.  Upon information and belief, Tamra was formed by the Lippo Group on or around June 26, 2017, for the sole purpose of acquiring the Company's assets out of bankruptcy as part of Defendants' self-dealing scheme.~~

33.    ~~31.~~Defendant Noble is a Delaware corporation.

## BACKGROUND

### I.    The Structure of SMP~~and CSM~~

34.    ~~32.CSM was~~ SMP has four members:  DXS, PacNet, SMI, and CC. Virtually all of SMP's assets consist of its membership interest in, and secured loan to, CSM, an entity that it formed in 2011 ~~and was~~as a midmarket mining company that holds a large land position in the Milford Mineral Belt near Milford, Utah.  ~~It~~CSM was in the business of mining and processing copper, gold, and silver.

35.    ~~33.~~SMP owns more than 99% of CSM and is its managing and majority member.  ~~DXS, PacNet, SMI, and CC are the only members of SMP.~~

13

~~Virtually all of SMP's assets consist of its membership interest in, and secured loan to, CSM.~~

36.    ~~34.The Company's~~ SMP's equity structure is as follows (percentages approximate):



## II.    The SMP ~~and CSM~~ Operating ~~Agreements~~Agreement

37.    ~~35.~~The parties' rights and obligations are governed by, among other things, ~~(i)~~ the Third Amended and Restated Limited Liability Company Agreement of SMP (the "SMP Agreement") ~~and (ii) the Limited Liability Company Agreement of CSM (the "CSM Agreement")~~.  Delaware law governs ~~both~~ the SMP ~~Agreement and the CSM~~ Agreement.

14

38. ~~36.~~The SMP Agreement permits DXS and PacNet to appoint a designee to the Board of Managers of each of SMP and CSM.  Each of DXS and PacNet appointed Cooper as its designee to each Board of Managers.

39. ~~37.~~Each of SMI and CC appointed designees to the Board of Managers for SMP and CSM.

40. ~~38.~~Section 5.1 of the SMP Agreement provides that "[e]xcept as otherwise provided in this Agreement . . . or by the Act, the business and affairs of the Company will be managed and all Company powers will be exercised by or under the direction of the Board of Managers."

41. ~~39.~~Section 5.1(g) of the SMP Agreement ~~and Section 5.1(e) of the CSM Agreement provide~~ provides that "a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders."

42. ~~40.~~Section 4.6 of the SMP Agreement requires the consent of 75% of the members, "excluding . . . Interested Members," for it to act on many material transactions, including certain financing transactions.  The SMP Agreement defines "Interested Members" as:

> [W]ith respect to any matter presented for approval of the Members, any Member to the extent that such Member or any Affiliate of such Member has a personal interest in the matter presented for approval which interest, on a Per Unit basis, is economically disproportionate to the interests of the other Members in such matter.

15

43.    41. Section 3.5 of the SMP Agreement, addressing the issue of

member loans to the Company, provides:

> [T]he Board of Managers is authorized to cause the
> Company to engage in such borrowing [from Members] .
> . . . The Board of Managers shall reasonably determine
> the amount of a loan to be requested and the terms of
> such loan.  To the extent any Member is making any such
> loan to the Company, each Member shall be entitled, but
> not required, to make its pro rata share (based on the
> Members' relative number of Units) of any such loans to
> the Company.

44.    42. Board of Managers authorization was thus required for a member

to possess a loan made to the Company company, and even where such a loan was

authorized, the other members were entitled to participate on a pro rata basis.

45.    43. Section 5.1(l)(ii) of the SMP LLC Agreement also imposes critical

confidentiality obligations on DXS and Noronha:

> DXS agrees, and shall procure that the DXS
> Representative agree in writing, to hold in confidence
> and trust all information provided to it or learned by it in
> connection with its rights under this Agreement; except
> to the extent disclosure of such information is required by
> law or any other regulatory process to which the DXS
> Representative is subject, in which case DXS shall
> provide notice of such required disclosure as early as
> practicable in order to permit the Company to seek a
> protective order or similar relief with respect to the
> disclosed information.

16

III.    The ~~Company Secures the~~ 2014 Noble Loan ~~in 2014 to Help~~ Helps Finance ~~Its~~ CSM's Growth

46.    ~~44.~~The ~~Company~~ CSM owned two major processing circuits consisting of (i) a flotation mill that produces a powder-like copper-gold-silver concentrate product, and (ii) a newly constructed vat-leaching and solvent-extracting electrowinning facility that produces pure copper cathode sheets (the "Phase II Facility").

47.    ~~45.~~The Phase II Facility was constructed as part of a growth strategy ~~that the Company agreed to undertake in 2014~~.  It was financed by SMP's equity holders (through capital investments amounting to approximately $40 million) and through a project finance senior debt facility of approximately $30 million (the Noble Loan).

48.    ~~46.~~The parties documented the Noble Loan in a Loan and Security Agreement, dated August 12, 2014~~, between CSM and Noble~~ (the "Noble Loan Agreement").

49.    ~~47.~~Section 9.07(b) of the Noble Loan Agreement provides that:

> The Lender may at any time with prior notice to the Borrower, assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement… pursuant to documentation acceptable to the Lender and the assignee.

50.    ~~48.~~Section 9.07(f) of the Noble Loan Agreement provides that:

17

"Eligible Assignee" means (a) an Affiliate of the Lender and (b) any other Person (other than a natural person) approved by the Borrower (such approval not to be unreasonably withheld or delayed; provided that no such approval shall be required if an Event of Default has occurred and is continuing.

51.    49.The purpose of these critical restrictions on Noble's ability to sell or assign the Noble Loan was, among other things, to prevent parties with an interest in SMP (e.g., members or lenders) from securing the substantial leverage over CSM (and thus SMP) that the Noble Loan Agreement provided.

52.    50.At the same time that they executed the Noble Loan Agreement, CSM and Noble the parties also executed a seven-year offtake agreement (the "Offtake Agreement"), through which Noble would be the exclusive buyer of the metals produced by the CompanyCSM, at a valuable discount to the then-prevailing market rates.

## IV.    The Lippo Group Blocks the Company SMP from Securing Capital in Furtherance of Lippo's Plan to Acquire the Noble Loan and Conceal Lippo's Debilitating Conflicts of Interest

53.    51.Beginning in 2014, DXS and PacNet – through Cooper – began to block reasonable financing proposals for the CompanySMP.  They refused, for example, to support a pro-rata equity round for SMP in late 2014 and early 2015, despite knowing that it needed capital in connection with CSM's to fund its Subsidiary's obligations under the Noble Loan Agreement.

18

54. 52. These financing opportunities were important to the Company SMP because they would have enhanced CSM's its ability to meet ensure that CSM met its debt obligations, and they would have supported the Phase II project. If the Lippo Group had not blocked SMP from accepting the financing offered to it and or CSM during this period, CSM would have been able to timely complete Phase II and pay off creditors.  In turn, this would have substantially reduced CSM's debt burden and positioned it for long-term financial stability the second $15 million draw down under the Noble Loan would have occurred months earlier than it actually did, such that Phase II would have been timely completed, and creditors would have been paid off, positioning SMI and CC to realize the value of their equity investments in SMP.

55. 53. In blocking those transactions reasonable financing opportunities, Cooper purported to exercise DXS's rights under Section 4.6(b) of the SMP Agreement.  That section effectively provided DXS (and thus the Lippo Group) blocking control over SMP (and thus CSM) by prohibiting it from undertaking a variety of fundamental actions without DXS's permission.  That included, for example:

- Approving SMP's and CSM's an annual budget;
- Taking on material debt;
- Issuing equity;
- Granting security interests in SMP or CSM assets;

19

- Appointing SMP and CSM management;
- Commencing or settling any material litigation; or
- Forming a new subsidiary.

56.   54.Section 4.6(b) of the SMP Agreement also provided negative controls to PacNet, including with respect to proposed financing arrangements.

57.   55.DXS and PacNet thus effectively controlled the CompanySMP, including essentially each of its significant financial and managerial decisions.

58.   56.Cooper's and the Lippo Group's repeated use of DXS's and PacNet's negative controls to prevent SMP from accepting financing (on its own or on CSM's behalf) was a breach of the SMP LLC Agreement and of Cooper's, DXS's, and PacNet's fiduciary duties.  Indeed, they did not exercise those rights to further the Company's SMP's interests; instead, they did so as part of a surreptitious plan that the Lippo Group had hatched to (i) prompt a potential event of default under the Noble Loan and then fraudulently induce Plaintiffs to amend the Noble Loan Agreement, so that in either event Noble could sell or assign that loan to a Lippo entity without CSM's (and thus SMP's) approval; (ii) acquire the Noble Loan and thereby obtain a senior secured creditor position; (iii) attempt to force a conversion of CSM's other senior secured debt facility (the WUMI Loan); and (iv) ultimately put CSM in an insolvent financial position so that the Lippo Group could acquire for itself – while eliminating Plaintiffs' participation interests – CSM and its assets at a substantial discount to its market valuedivest SMP (and

20

thus CC and SMI) of its membership interest in CSM and to acquire CSM's assets for themselves.

59.   57.As early as October 2015, Cooper had explained in an email to Noronha:

> Then I would at request of Noble, consider buying that debt at a large discount, which the [Riady] family would then have full security [in CSM] and take some upside on debt.  **Then we can sit back and hold our position and when this collapses we have the first lien and can buy it out of bankruptcy very cheap.**

60.   58.The Lippo Group was motivated to develop and pursue that plan in significant part by its assessment that the Company was worth it could realize more than $600 million worth of value by divesting SMP (and thus SMI and CC) of its interest in CSM.

61.   59.That valuation, on information and belief, was based in part on (a) Cooper having been told – on a confidential basis and in his capacity as a Company Manager company manager – by Newmont Mining (one of the largest mining companies in the world) that CSM's properties contained included a "world class" copper porphyry deposit based on their analyses, and (b) many days on-site gathering information and producing reports and memos, none of which was shared with other Managers or members despite multiple requests, and (c) the recruitment of CSM personnel to directly transmit information to them.  During the

21

relevant time period, Cooper failed to disclose these material facts to SMI or CC, but shared it only with SMP's other members (DXS and PacNet).

62.    60.The Lippo Group's plan to acquire CSM through this illicit scheme reached the conglomerate's highest levels.  The Riadys, on behalf of themselves and LCR, provided direction to Cooper and Noronha as they executed the Lippo Group's strategy.

63.    61.The Lippo Group – and therefore each of Cooper, Noronha, DXS, and PacNet, among the other Lippo entities – had and acted on a material conflict of interest with the Company SMP and its other members.  Whereas the Lippo Group wanted to disadvantage CSM (and thus SMP and its members) for its own gain, SMP and its members had an interest in growing CSM, maximizing their substantial equity investments, and, at a minimum, maintaining its the solvency and success of their assets.

64.    62.Each of Cooper, DXS, and PacNet had a duty to disclose that conflict of interest to SMP, its other members, SMI and CSMCC.  Instead, they fraudulently concealed it.

65.    63.They also fraudulently concealed that, in connection with the various financing proposals that they rejected, they qualified as Interested Members pursuant to Section 4.6(b) of the SMP Agreement and thus should have been excluded from considering or voting thereon.

22

**V. The Lippo Group Negotiates to Usurp ~~the Company's~~ Plaintiffs' and SMP's Opportunity to Acquire the Noble Loan ~~,~~ and Instead Acquire It for Itself**

66. ~~64.~~In or around late 2015, the Lippo Group – including Cooper and Noronha – negotiated with Noble to acquire the Noble Loan. The Lippo Group concealed these negotiations from ~~SMP~~SMI, ~~its other members~~CC, and ~~CSM~~SMP.

67. ~~65.~~During those negotiations, Noble informed the Lippo Group that it wanted to sell the Noble Loan in the near term and was willing to do so at a substantial discount to its face value. Defendants affirmatively misrepresented to ~~Plaintiffs~~ SMI, CC, and SMP that Noble would not sell the Noble Loan at a discount.

68. ~~66.~~The Noble Loan Agreement required Noble to secure ~~the Company's prior~~ approval to sell or assign the Noble Loan to an entity (with the exception of a sale or assignment to an "affiliate of the Lender [Noble]"). (Noble Loan Agreement §§ 9.07(b), (f).) Noble was also expressly prohibited from selling financial participations in the Noble Loan to "any of the Borrower's Affiliates or Subsidiaries~~."~~" – including the Lippo Group and all of its affiliates. (Id. § 9.07(c).) The purpose of these restrictions, among other things, was to prevent ~~a member of the Company~~ one of SMP's members from benefiting from a default by ~~the Company~~its Subsidiary, and putting decision makers in positions with debilitating conflicts of interest against the other members of SMP.

23

69. 67. In early November 2015 – consistent with Defendants' plan – Noble informally claimed that "Events of Default" had occurred under the Noble Loan Agreement and, in connection therewith, explicitly reserved its purported right "to sell or assign" the Noble Loan to "one or more Eligible Assignees without the consent of the Company."

70. 68. Notwithstanding its reservation of rights, Noble did not declare an take any action to enforce its rights due to the alleged Event of Default (and, in fact, thereafter formally waived the alleged Event of Default). That was consistent with the parties' prior practice, where the Company and Noble whereby they revised timetables for various steps contemplated by the Noble Loan Agreement. As a practical matter, Noble could not declare pursue an Event of Default because doing so would (i) forfeit its valuable rights under the parties' Offtake Agreement, (ii) would further impair the value of its debt by precluding the debt-to-equity conversion of the WUMI Loan that was senior to the Noble Loan, and (iii) would generally impair the marketability and value of the Noble Loan.

71. 69. Although Noble could not and did not declare pursue a default, Noble proposed that CSM execute the SMP members approve execution of a document titled the "Fourth Amendment to Loan and Security Agreement" (the "Fourth Amendment"), which would amend certain terms of the Noble Loan Agreement. The Fourth Amendment confirmed that "no Default or Event of

24

Default has occurred and is continuing as of the Fourth Amendment Effective

Date."

72. ~~70.~~The proposed Fourth Amendment provided that Noble would be

"entitled to sell and assign all or any portion of the Loan . . . without the consent of

the Borrower or its Affiliates."  The Fourth Amendment was thus intentionally

drafted – unbeknownst to ~~Plaintiffs and the Company~~ SMI, CC, or SMP at the time

– to further Defendants' plan so that, if and when it became effective, Noble would

be able to close on the secret deal they already had reached to sell the Noble Loan

to the Lippo Group without ~~CSM's~~ Plaintiffs' consent.

73. ~~71.~~Neither Noble nor the Lippo Group disclosed to ~~the Company~~

SMI, CC, or SMP the material fact that the Fourth Amendment's terms were in

furtherance of the Lippo Group's illicit plan to acquire the Noble Loan to the

~~Company's~~ detriment of SMI, CC, and SMP.  To the contrary, in the face of

Plaintiffs~~'~~ raising concerns about the proposed amendment, Defendants

represented that there was no plan (let alone a deal) to sell the Noble Loan to the

Lippo Group, and Noble represented that it would not be selling the Noble Loan at

a discount.  Both of those representations were false.  In reliance on those

representations, ~~the Company~~ SMI, CC, and SMP consented to the Fourth

Amendment.

25

74. 72.Had the Lippo Group disclosed its plan to Plaintiffs (, or had Noble disclosed ~~that planned~~ the fact that it was planning (and in fact already had reached a deal) to sell the loan to the Lippo Group), Plaintiffs would not have ~~caused CSM (through SMP) to consent~~ consented to the Fourth Amendment.

## VI. The Lippo Group Conceals Its Plan to Acquire the Noble Loan, While Continuing to Block Capital Fundraising Efforts

75. 73.In late 2015, Noble told SMP and others that it was interested in selling the Noble Loan in the near-term, but that ~~— contrary to what it had told the Lippo Group —~~ it would not be willing to do so at a substantial discount to the loan's face value – contrary to what it actually had negotiated with the Lippo Group behind Plaintiffs' backs.

76. 74.This was nonetheless a rare and valuable opportunity for ~~the Company~~SMP.  It was uniquely positioned to acquire the Noble Loan on advantageous terms where ~~(i) Noble~~ i) Noble was interested in selling the loan on a very compressed timeline and ~~(ii) only the Company~~ ii) only SMP (or insiders thereof) could have bought the loan on such a timeline by acting on insider knowledge and information received with respect to the ~~Company's prospects for true~~ long-term ~~success~~value of the project, including reports regarding ~~the Company's~~mineral deposits and prospects for the mines.

77. 75.SMI's appointee to each Board of Managers, David J. Richards ("Richards"), explained this opportunity to SMP's members and urged them to

26

pursue it collectively and collaboratively.  Indeed, the parties clearly had the

financial wherewithal given the over $90 million in equity investments in SMP that

historically had been provided as needed.

78.    76.In SMP Board of Managers meetings at both the SMP and CSM

levels, the parties discussed and regarded the prospect of the Company acquiring

the Noble Loan as a corporate opportunity.  They discussed, for instance,

potentially arranging for one of SMP's members to acquire the Noble Loan,

inviting the other members to participate, and then restructuring the loan's terms in

a manner that would benefit the CompanySMP and all of its members.  Plaintiffs

and SMP management supported its pursuit of the opportunity, and for good

reasons: if the Company were to close on that opportunity would facilitate SMP's

efforts to advance the progress of the mining project, by the spring of 2016, it

which would have held a low debt burden, been financeable by a variety of means

including existing equity holders, and be well-positioned to further drill out its the

properties to develop additional resources.  Plaintiffs were ready, willing, and able

to make an offer to purchase the Noble Loan for the Company's benefit of SMP

and all of its members.

79.    77.During those internal discussions, the Lippo Group continued to

conceal its secret plan to acquire the Noble Loan for itself (rather than the

Company~~SMP~~) and the fact that it was negotiating that very transaction behind ~~the~~

~~Company's and Plaintiffs'~~ SMI's, CC's and SMP's backs.

80.    ~~78.~~Indeed, Cooper continued to defraud ~~Plaintiffs~~ SMI, CC, and SMP

and repeatedly misrepresented that he had "no knowledge" of any discussions

between Lippo and Noble – despite being deeply involved therein and routinely

discussing and planning the same with the Riadys and Noronha.

81.    ~~79.~~Defendants withheld other material information from Plaintiffs,

including that Noble (i) had asserted that it had a hard December 31, 2015,

deadline to sell the Noble Loan and (ii) was in fact willing to sell the loan at a

substantial discount.

82.    ~~80.~~Through a series of emails and discussions in or around the

timeframe of November 22-26, 2015, less than one month after Noble had reserved

its rights to call a default, Noble had already conspired with the Lippo Group and

entered into an agreement in principle ~~via email~~ with the Lippo Group to sell the

loan to the Lippo Group for approximately $~~22~~ 23 million (an approximate ~~33~~30%

discount off its $33 million face value).

83.    ~~81.~~In December 2015, at SMP ~~and CSM~~ Board meetings, the Lippo

Group – including Cooper specifically – fraudulently concealed from Plaintiffs that

~~they~~ the Lippo Group and Noble ~~had~~ already had conspired and agreed on a sale of

the Noble Loan~~.~~, even while procuring further investments from ~~Plaintiffs~~SMI and

28

CC.  Indeed, after reaching its secret agreement to acquire the Noble Loan from

Noble, the Lippo Group fraudulently induced ~~Plaintiffs~~ SMI and CC to infuse an

additional $6.8 million into SMP that the Lippo Group was planning to take for

itself ~~shortly thereafter~~.  In connection with that financing, Defendants advocated

for a valuation of more than $2,200 per unit, leaving ~~the Company~~ SMP with a

more than $150 million equity valuation at the conclusion of that financing round

in December 2015.  Plaintiffs would not have agreed to contribute any additional

funds had Defendants disclosed (and not affirmatively misrepresented and lied

about) their secret dealings with Noble or their illicit plan.

     84.   ~~82.~~ In addition, consistent with their plan, the Lippo Defendants~~' plan~~

~~to drive the Company into insolvency, they~~ continued to interfere with ~~CSM's~~

~~SMP's~~ efforts to ~~meet its~~ finance CSM's Noble Loan obligations ~~under the Noble~~

~~Loan or the Company's~~ and SMP's efforts to acquire the loan, including by

continuing to ~~unlawfully~~ improperly exercise their blocking power.  CSM had, for

instance, secured financing proposals in the form of a $4 million government-

backed loan from Stonehenge Capital Company, LLC and a separate $2 million

proposal from the same entity.  These were state-tax-credit sponsored, low-interest

rate loans, which would have helped stabilize the ~~Company~~ company, likely would

have ~~likely~~ facilitated timely completion of the Phase II facilities, and averted the

~~Company's~~ company's associated financial problems.  However, DXS and PacNet

29

– in furtherance of the Lippo Group's secret plan – blocked both transactions, again without disclosing their self-serving purposes and their ~~interest in slowing the Company's progress~~<u>true plan to harm SMP and divest it of its assets</u>.

<u>85.</u>    ~~83.~~Likewise, Defendants deviated from the members' historical practice and blocked proposed member financings, which would have been sufficient to enable SMP, ~~CSM,~~ or a friendly member or entity, to acquire the Noble Loan for the ~~Company's~~ benefit <u>of all of SMP's members</u> and to continue to support the Phase II development<u> of the mining facilities</u>.  Historically, SMP's members had contributed the financing necessary to support CSM's growth and development (or supported debt financing instead).  The late 2015 time period was no exception – <u>SMP and its</u> members were prepared to address ~~CSM's~~<u>their</u> <u>Subsidiary's</u> capital requirements – but the Lippo Group prevented that.

<u>86.</u>    ~~84.~~On or about December 24, 2015, Plaintiffs finally uncovered Defendants' divided loyalties and dishonest dealings when Richards was mistakenly copied on an internal Noble email, revealing that Defendants had been planning for Waterloo, a Lippo entity, to acquire the Noble Loan.

<u>87.</u>    ~~85.~~On December 30, 2015, SMI and CC sent a letter to DXS, PacNet, Cooper, and Noble, stating that material information had been concealed or withheld from Plaintiffs in connection with ~~the Company's~~<u>their</u> prior consent to the Fourth Amendment.  Plaintiffs explained that the consents were thereby void,

30

withdrawn, and that the conditions precedent to the Fourth Amendment becoming effective had not been met.

88.   ~~86.~~Plaintiffs further explained that they "vigorously do and will contest and oppose by all means, and do not and have not consented or approve on our own behalf or on behalf of CS Mining or SMP, of the transfer" of the Noble Loan "to a non-affiliate of Noble, including but not limited to any individual shareholders or board members of SMP or CS Mining, or affiliates or controlled or backed parties of such entities, or any other party."

## VII.   The Lippo Group Ignores ~~the Company's~~ **SMI's, CC's and SMP's** Objections and Acquires the Noble Loan Through Waterloo

89.   ~~87.~~Rather than taking pause in the face of ~~the Company's objection~~ SMP's, SMI's and CC's objections to the Noble Loan's assignment to a Lippo entity, Defendants accelerated their plan.

90.   ~~88.Indeed, on~~ On December 31, 2015 – the day after Plaintiffs set forth their written objection to the conspiracy they had just uncovered through the inadvertent email, including the plan to assign the Noble Loan to the Lippo Group – the Lippo Group acquired the loan from Noble for approximately $~~22~~ 23 million. (Tellingly, at ~~the Company's~~ SMP's aforementioned December 2015 Board meetings, Plaintiffs had proposed that SMP adopt a specific corporate-opportunities policy.  In response, Cooper feigned support for the idea, but insisted

31

that the issue be taken up in January which, as planned and actually turned out, was
~~after~~ Cooper had helped the Lippo Group acquire the Noble Loan.)

91.    ~~89.~~Over ~~the Company's~~ SMP's strenuous objection, Defendants
breached both the SMP Agreement and the Noble Loan Agreement because they
~~effected~~ effectuated the Waterloo acquisition ~~(i) without prior notice to CSM, (ii)~~
without approval from the SMP Board of Managers, and ~~(iii)~~ with an
impermissible assignee, where Waterloo was ~~neither~~ not an affiliate of Noble ~~nor a~~
~~CSM-approved~~ and not approved by the Loan Parties as an assignee.

92.    ~~90.~~The Lippo Group was aware of these contractual limitations on
Noble's ability to sell the Noble Loan to it.  The Lippo Group caused Noble to
breach those obligations in furtherance of the Lippo Group's interest in ~~becoming a~~
acquiring the debt and exploiting its conflicting positions as SMP member and
creditor ~~of CSM~~.

93.    ~~91.~~In addition, the Lippo Group unlawfully acquired the Noble Loan
by using ~~the Company's~~ confidential information in violation of numerous
restrictions that precluded the Lippo Group from doing so.  The Lippo Group's
violation of those restrictions enabled it to develop an offer for the Noble Loan,
freeze ~~the Company~~ SMP (and SMP's friendly members) out of that corporate
opportunity, and negotiate a favorable secret deal at ~~the Company's~~ SMP's, SMI's
and CC's expense.

32

**VIII.    The Lippo Group Leverages Its Control Over SMP ~~and CSM to Acquire CSM's~~ , Starves SMP of Funds, Divests It of Its Assets ~~,~~ and Acquires Them at an Enormous Discount ~~in Bankruptcy~~**

94. ~~92.~~After acquiring the Noble Loan through Waterloo, the Lippo Group continued to starve SMP of funds ~~and forced CSM closer to insolvency~~. The Lippo Group acted on its debilitating conflict of interest to cause its agents (including Company management) to take harmful actions which were not approved by ~~the Company's Boards~~SMP's Board, including substantial staff reductions, directing payments to specific vendors, suggested modifications to equipment loans, and material changes to operational plans – all designed to further its purpose of ~~slowing the Company's growth and driving it into bankruptcy~~depressing the value and financial abilities of SMP and perceived value of CSM.

95. ~~93.~~Indeed, at the time, SMP was in the midst of restructuring CSM's financial operations and debts – including the Noble Loan – to position CSM to meet its debt obligations, to have sufficient runway to complete the Phase II construction, and to undertake a $10 million equity raise.  That included, for example, ~~the Company~~ having productive discussions with CSM's creditors to restructure its debt and otherwise defer payment to ensure its financial stability.

96. ~~94.~~The Lippo Group, however, prevented ~~the Company~~ that from ~~doing so~~happening or otherwise securing additional liquidity.  The Lippo Group's

33

RLF1 18989228v.1

acquisition of the Noble Loan also substantially impaired ~~the Company's~~ SMP's ability to obtain additional financing in the market due to the market's knowledge of the Lippo Group's broad control and leverage over ~~the Company~~SMP.

97.  ~~95.~~In addition, in March and May 2016, ~~Plaintiffs~~ SMI and CC proposed that the SMP members invest $20 million that could be used by SMP to stabilize CSM's operations and avoid insolvency, subject to a marginal adjustment in amortization of the Noble Loan.  Consistent with its plan ~~to drive CSM into financial trouble~~, however, the Lippo Group rejected that capital raise.  Had the Lippo Group been interested in simply having the Noble Loan paid off (as a non-conflicted lender would have been), it would have agreed to Plaintiffs' proposed modification.  But the Lippo Group was not like a typical lender; it had placed itself in a uniquely conflicted position, and was acting on severe, debilitating conflicts of interest, abusing its insider status to advance its own interests at the expense of ~~the Company~~SMP, SMI, and CC.

98.  ~~96.~~Indeed~~, rather than assisting the Company to avoid financial difficulties~~, the Lippo Group continued to manipulate ~~the Company~~ SMP in furtherance of its scheme.  For example, Cooper and Noronha instructed SMP management to cause CSM to draw down the full principal amount of the Noble Loan and caused CSM to undertake a $5 million high-interest-rate loan.  Cooper and Noronha were on site while this multi-tranche facility was negotiated and

34

portions were advanced.  As advances were made, they directed SMP management

how to spend the funds to advance their self-interested goal (as admitted to ~~the~~

SMP's CEO) to reduce payables for each vendor supporting the Phase II project to

less than $200,000.

99.    ~~97.~~Their purpose in doing so was not to further ~~the Company's~~ SMP's

or its members' interests.  Rather, by directing payments in that manner (at the

expense of taking on a high-interest loan and securing a guaranty from SMP

ultimately used by Lippo Group in its plan) and causing CSM to draw down on the

Noble Loan, Lippo Group was attempting to cause the satisfaction of a "Project

Completion Date" provision in the intercreditor agreement between WUMI and

Noble, in an attempt to (i) trigger a mandatory conversion of that senior debt into

equity of SMP~~;,~~ (ii) advance the seniority of the Lippo Group's secured creditor

position (through the Noble Loan)~~;,~~ and (~~iii) better~~ iii) better position the Lippo

Group to acquire CSM~~ or its~~'s assets for itself in bankruptcy and, at the same time,

divest SMP of its interest in the same.

100.    ~~98.~~In June 2016, consistent with the Lippo Group's longstanding

plans, an involuntary bankruptcy petition was brought against CSM~~.,~~ and in

August 2017, the bankruptcy case proceeded to sale.  Bidding on the assets

reflected the reality that Defendants' actions had caused:  the considerable delay in

the completion of Phase II operations caused a domino effect which led to the

35

bankruptcy, and the Lippo Group (an SMP member) held a secured creditor position. Thus, Tamra Mining Company, LLC ("Tamra") – a Lippo affiliate – won the bidding and acquired all of CSM's assets for approximately $40 million. The Lippo Group had thus successfully divested SMP of its interest in CSM's assets and extinguished the value of SMI's and CC's significant equity value and investments in SMP.

99. ~~In August 2017, the bankruptcy case proceeded to sale. Given the Lippo Group's secured creditor position, its control over the Company, its bid-chilling bankruptcy strategy, and the fact that Defendants had positioned CSM for sale before substantial Phase II operations had completed, bidding was severely depressed. The Lippo Group's significant financial resources, insider knowledge, and pre-bankruptcy actions positioned the Lippo Group to win the bidding and to acquire, through Tamra, all of CSM's assets for approximately $40 million.~~

100. ~~The Lippo Group thus acquired CSM for less than 10% of its "conservative" $600 million valuation and achieved that windfall while unlawfully extinguishing Plaintiffs' significant equity value and investment in SMP.~~

## IX. Demand Is Futile

101.   Plaintiffs SMI and CC bring the single derivative causes of action in this Complaint for the benefit of SMP to redress the injuries suffered, and to be suffered, by SMP as a result of Defendants' wrongdoing.

36

102.    Plaintiffs SMI and CC were members of SMP during Defendants' wrongful course of conduct and continue to be members as of the date of this Complaint.

103.    Despite Plaintiffs' insistence that Defendants fulfill their legal obligations to Plaintiffs, Defendants have failed to rectify the wrongs described in this Complaint because Defendants suffer from conflicts of interest and divided loyalties, which expose them to a substantial likelihood of being liable for their wrongdoing but also preclude them from exercising their independent business judgment on these matters.

104.    Pursuant to Section 4.6(b) of the SMP Operating Agreement, DXS has a blocking right with respect to the "commencement or settlement of any claim, demand or litigation resulting in projected costs and expenses or benefits in an amount greater than $3,000,000, or which is otherwise material in the context of the business of Skye or any subsidiary."  Demand is thus futile because DXS, which stands to be liable for its disloyal conduct and in connection with the claims herein, would not permit SMP to bring these claims against it and the other Lippo affiliates.

**FIRST CAUSE OF ACTION**
~~Breach of Fiduciary Duty~~
~~Defendant Cooper~~
**Fraud**
**Defendants Cooper, Noronha, PacNet, and DXS**
**(Direct on Behalf of SMI and CC)**

37

105.   Plaintiffs reallege the foregoing allegations.

106.   Cooper, Noronha, PacNet, and DXS made intentional misrepresentations to SMI and CC of material fact and intentionally omitted material facts regarding their plan for the Lippo Group to acquire the Noble Loan, including as to (i) Noble's willingness to sell the loan at a substantial discount; (ii) their negotiations and agreement with Noble to acquire the Noble Loan through Waterloo; (iii) the preparation of the Fourth Amendment to the Noble Loan Agreement in furtherance of their plan to acquire the loan through Waterloo; (iv) their plan to attempt to convert the WUMI Loan solely in order to enhance their creditor position; and (v) their plan to depress the value of SMP interests by acquiring its assets for themselves at a substantial discount.

107.   SMI and CC justifiably relied on those misrepresentations.  These Defendants went to great lengths to conceal their plan to harm SMI and CC, and the success of their plan, in significant part, depended on that concealment.  Had Plaintiffs known of these Defendants' ulterior motives, Plaintiffs would not have continued to contribute funds to SMP and would have acted to prevent these Defendants' from executing their plan.

108.   These Defendants' misrepresentations and omissions were intentional.  Cooper, Noronha, PacNet, and DXS intended for SMI and CC to remain ignorant of the Lippo Group's secret dealings and illicit plan.

38

RLF1 18989228v.1

109.   As a direct and proximate result of Cooper's, Noronha's, DXS's, and PacNet's fraud, SMI and CC have suffered damages in an amount to be determined at trial.

<strong>SECOND CAUSE OF ACTION</strong><br/><strong>Breach of § 5.1(l)(ii) of the SMP Agreement</strong><br/><strong>Defendants DXS and Noronha</strong><br/><strong>(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)</strong>

110.   Plaintiffs reallege the foregoing allegations.

111.   Defendant DXS is a party to the SMP Agreement with CC and SMI.

112.   CC and SMI have performed their obligations under the SMP Agreement.

113.   On information and belief, in the course of their efforts to divert the opportunity to purchase the Noble Loan away from SMP, Defendants DXS and Noronha breached § 5.1(l)(ii) of the SMP Agreement by failing to hold information obtained in connection with that agreement in confidence and trust, and by revealing such information to the Lippo Group.

114.   On information and belief, for example, Defendant Noronha revealed confidential information that he obtained in his capacity as a DXS Representative to Waterloo and/or its affiliates or parents, in order to assist the Lippo Group and to enable Waterloo to unlawfully acquire the Noble Loan.

115.   The breach of Section 5.1(l)(ii) of the SMP Agreement by DXS and Noronha harmed SMP, SMI, and CC, including by enabling the Lippo Group to

39

acquire the Noble Loan where it would not have otherwise been able to do so on the terms and timeline demanded by Noble.

116.    As a direct and proximate result of Defendants DXS's and Noronha's breach of the SMP Agreement, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**Defendants DXS and PacNet**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

117.    Plaintiffs reallege the foregoing allegations.

118.    DXS and PacNet had an implied covenant to exercise their blocking rights under the SMP Agreement in good faith.

119.    DXS and PacNet breached that duty by, among other things, exercising their blocking rights for the purpose of starving SMP of timely capital on reasonable terms in furtherance of the Lippo Group's concealed plan to depress the value of SMP and its interests and acquire for itself the mining assets at a substantial discount so that SMP, SMI, and CC were eliminated from the picture.

120.    As a direct and proximate result of DXS's and PacNet's actions, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

40

### FOURTH CAUSE OF ACTION
### Tortious Interference with Contract
### Defendants Cooper, Noronha, Waterloo, and LCR
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

121.   Plaintiffs reallege the foregoing allegations.

122.   Defendants Cooper, Noronha, Waterloo, and LCR were aware of DXS and PacNet's obligations under the SMP Agreement.

123.   In furtherance of the Lippo Group's illicit plan to extinguish SMI's and CC's equity value, divest SMP of its assets, and acquire those assets for themselves, Defendants Cooper, Noronha, Waterloo, and LCR caused DXS and PacNet to breach its obligations under the SMP Agreement, including Sections 4.6(b) and 5.1(l)(ii) of the SMP Agreement.

124.   By causing DXS and PacNet to breach the SMP Agreement, these Defendants tortuously interfered with those contracts.

125.   As a direct and proximate result of that tortious interference, SMP, SMI, and CC have suffered damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Breach of § 3.5 of the SMP Agreement
### Defendants DXS and PacNet
### (Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)

126.   Plaintiffs reallege the foregoing allegations.

127.   Defendant DXS and PacNet are parties to the SMP Agreement with Plaintiffs CC and SMI.

41

128.    CC and SMI have performed their obligations under the SMP Agreement.

129.    Under Section 3.5 of the SMP Agreement, Board of Managers authorization was required for a member to possess a loan made to SMP and, even where such a loan was authorized, the other members were entitled to participate on a pro rata basis.

130.    Waterloo, an affiliate of DXS and PacNet, was thus prohibited from acquiring the Noble Loan without SMP's authorization.

131.    SMP did not authorize Waterloo's acquisition of the Noble Loan and, in fact, objected to it.

132.    DXS and PacNet thus breached Section 3.5 of the SMP Agreement by assisting their affiliate, Waterloo, acquire the Noble Loan.

133.    As a direct and proximate result of that breach of the SMP Agreement, SMP, CC, and SMI have suffered damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**Defendant Cooper**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

134.    Plaintiffs reallege the foregoing allegations.

135.    106. Defendant Cooper is (and at all times relevant was) a Manager and Chairman of SMP, was a Manager and Chairman of CSM, and owes (and at all

42

times relevant owed) fiduciary duties – including the duties of due care, loyalty, and candor – to CSM, SMP, and each of their respective its members, including SMI and CC, under common law, § 5.1(e) of the CSM Agreement, and § and Section 5.1(g) of the SMP Agreement.

136.    107.Because SMP is effectively the sole owner of CSM, Cooper had a responsibility when acting on behalf of CSM to act for the sole benefit of SMP.

137.    108.Cooper acted in bad faith and breached his fiduciary duty of loyalty to the SMP, SMI, and PlaintiffsCC, including by:

- Placing his own and the Lippo Group's interests, to control and own CSM or its SMP's assets, above the interests of the Company SMP, SMI, and PlaintiffsCC;

- Concealing his and the Lippo Group's conflict of interest with that of the Company SMP and its other members;

- Concealing material information from the Company SMP, SMI, and CC relating to the anticipated purchase of the Noble Loan by the Lippo-affiliate, Waterloo;

- Causing and assisting the Lippo-affiliate Waterloo to acquire the Noble Loan at a substantial discount – including through the use of confidential Company information – and thereby acting in the interests of the Lippo Group rather than the CompanySMP;

- Covertly and unlawfully diverting a corporate opportunity belonging to the Company SMP and its members to Waterloo; and

- Concealing material information from the Company SMP, SMI, and CC regarding the Lippo Group's interest in starving CSM for capital and ultimately purchasing it at a discount to the Lippo Group's sole benefitextinguishing the value of SMP, divesting it of its core assets and interest in CSM, and acquiring CSM's assets for the sole benefit of the Lippo Group.

43

138.    ~~1.~~Cooper's self-dealing and deliberate disregard for the interests of those to whom Cooper owed fiduciary duties amount to a breach of his duty of loyalty.

139.    ~~2.~~As a direct and proximate result of Cooper's bad faith and breach of his fiduciary duties, SMI, CC, and SMP ~~and Plaintiffs~~ have suffered damages in an amount to be determined at trial.

~~SECOND~~ SEVENTH CAUSE OF ACTION<br>
**Breach of Fiduciary Duties**<br>
**Defendants DXS and PacNet**<br>
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

140.    ~~3.~~Plaintiffs reallege the foregoing allegations.

141.    ~~4.~~DXS and PacNet, acting individually and in concert, exercised actual control over ~~the Company~~SMP, including through the exercise of their powers under the SMP ~~and CSM Agreements~~Agreement.

142.    ~~5.~~In exercising such control of ~~the Company~~SMP, DXS and PacNet owed fiduciary duties to ~~the Company~~ SMP and its members, including the duties of care, loyalty, and candor.

143.    ~~6.~~DXS and PacNet breached their fiduciary duties to ~~the Company~~SMP, including by:

- Placing their own and the Lippo Group's interests, to control and own CSM or its assets, above the interests of ~~the Company~~ SMP, SMI, and ~~Plaintiffs~~CC;

44

- Using their blocking rights to starve ~~the Company~~ SMP of capital, in furtherance of the Lippo Group's interests and to ~~the Company's~~ SMP's and its members' detriment;

- Concealing material information from ~~the Company~~ SMP, SMI, and CC relating to the anticipated purchase of the Noble Loan by the Lippo-affiliate Waterloo;

- Causing and assisting the Lippo-affiliate Waterloo, to acquire the Noble Loan at a substantial discount – including by using confidential Company information – and thereby acting in the interests of the Lippo Group rather than the ~~Company's~~ interests of SMP and its members;

- Covertly and unlawfully diverting to Waterloo a corporate opportunity belonging to ~~the Company~~ SMP and its members ~~to Waterloo~~; and

- Concealing material information from ~~the Company~~ SMP, SMI, and CC regarding the Lippo Group's interest in ~~starving CSM for capital and ultimately purchasing it at a discount~~ in extinguishing the value of SMP, divesting it of its core assets and interest in CSM, and acquiring CSM's assets for the sole benefit of the Lippo Group.

144. ~~7.~~ DXS and PacNet's self-dealing and deliberate disregard of the interests of those to whom they owed fiduciary duties constitute a breach of those duties.

145. ~~8.~~ As a direct and proximate result of DXS's and PacNet's bad faith and breach of fiduciary duties, SMP~~,~~ , SMI, and ~~Plaintiffs~~ CC have suffered damages in an amount to be determined at trial.

45

## ~~THIRD~~ EIGHTH CAUSE OF ACTION
**Aiding and Abetting Breach of Fiduciary Duty**
**Defendants DXS and PacNet**
**(in the alternative to ~~Second~~ Seventh Cause of Action)**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

146.   ~~9.~~Plaintiffs reallege the foregoing allegations.

147.   ~~10.~~Defendant Cooper owed fiduciary duties to ~~the Company~~ SMP and Plaintiffs.

148.   ~~11.~~Defendants DXS and PacNet knew that Defendant owed fiduciary duties to ~~the Company~~ SMP and Plaintiffs.

149.   ~~12.~~As part of the Lippo Group's self-serving plan, DXS and PacNet nevertheless furthered and knowingly participated in the breaches of fiduciary duties committed by Cooper.

150.   ~~13.~~As a direct and proximate result of DXS and PacNet having aided and abetted Cooper's breach of his fiduciary duties, SMP~~,~~, SMI, and ~~Plaintiffs~~ CC have suffered damages in an amount to be determined at trial.

## ~~FOURTH~~ NINTH CAUSE OF ACTION
**Aiding and Abetting Breach of Fiduciary Duty**
**Defendants Noronha, Waterloo, Michael Riady, Stephen Riady,~~Tamra,~~ LCR, and Noble**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

151.   ~~14.~~Plaintiffs reallege the foregoing allegations.

152.   ~~15.~~Defendants Cooper, DXS, and PacNet owed fiduciary duties to ~~the Company~~SMP.

46

153. ~~16.~~Defendants Noronha, Waterloo, Michael Riady, Stephen Riady~~,~~ ~~Tamra~~, LCR, and Noble knew that Defendants Cooper, DXS, and PacNet owed fiduciary duties to ~~the Company~~ SMP and Plaintiffs.

154. ~~17.~~As part of the Lippo Group's self-serving plan, these Defendants nevertheless furthered and participated in the breaches of fiduciary duties committed by Cooper, DXS, and PacNet.

155. ~~18.~~As a direct and proximate result of these Defendants having aided and abetted Cooper's, DXS's, and PacNet's bad faith and breach of fiduciary duties, SMP~~-~~, SMI, and ~~Plaintiffs~~CC have suffered damages in an amount to be determined at trial.

**~~FIFTH~~ TENTH CAUSE OF ACTION**
**Civil Conspiracy**
**Defendants Cooper, Noronha, DXS, PacNet, Waterloo, Michael Riady, Stephen Riady, ~~Tamra,~~ and LCR**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

156. ~~19.~~Plaintiffs reallege the foregoing allegations.

157. ~~20.~~Defendants Cooper, Noronha, DXS, PacNet, Waterloo, Michael Riady, Stephen Riady, ~~Tamra,~~ and LCR constitute a combination of two or more persons.

158. ~~21.~~These Defendants had a meeting of the minds on a course of action, the object of which was, among other things, to ~~undermine the Company's business,~~ divert a corporate opportunity from ~~the Company~~SMP, rush through the

47

unlawful assignment of the Noble Loan to Waterloo, facilitate the issuance of

Noble's December 30, 2015, reservation of rights and notice of default, and ~~to~~

~~drive CSM into insolvency, thereby positioning the Lippo Group to acquire CSM~~

~~or all of its~~ assets ~~at a substantial discount~~ divest SMP of its assets (while acquiring

those assets for the sole benefit of the Lippo Group), with the net effect of

eliminating SMP, SMI, and CC from the picture.

159. ~~22.~~In furtherance of their conspiracy, these Defendants undertook

overt, unlawful acts, including but not limited to violations of fiduciary duties,

breaches of contractual obligations, and interference with economic relations as set

forth in this Complaint.

160. ~~23.~~As a direct and proximate result of these Defendants' conspiracy,

SMP~~,~~ SMI, and ~~Plaintiffs~~ CC have suffered damages in an amount to be

determined at trial.

### ~~SIXTH CAUSE OF ACTION~~
### ~~Breach of § 5.1(l)(ii) of the SMP Agreement~~
### ~~Defendants DXS and Noronha~~
~~24.    Plaintiffs reallege the foregoing allegations.~~

~~25. Defendant DXS is a party to the SMP Agreement with Plaintiffs CC and SMI.~~

~~26. Plaintiffs CC and SMI have performed their obligations under the SMP~~

~~Agreement.~~

~~27. On information and belief, in the course of their efforts to divert the opportunity to~~

~~purchase the Noble Loan away from the Company, Defendants DXS and Noronha~~

48

breached § 5.1(l)(ii) of the SMP Agreement by failing to hold information obtained in connection with that agreement in confidence and trust, and by revealing such information to the Lippo Group.

28.    On information and belief, for example, Defendant Noronha revealed confidential information that he obtained in his capacity as a DXS Representative to Waterloo and/or its affiliates or parents, in order to assist the Lippo Group and to enable Waterloo to unlawfully acquire the Noble Loan.

29. The breach of § 5.1(l)(ii) of the SMP Agreement by DXS and Noronha harmed SMP and Plaintiffs, including by enabling the Lippo Group to acquire the Noble Loan where it would not have otherwise been able to do so on the terms and timeline demanded by Noble.

30. As a direct and proximate result of Defendants DXS's and Noronha's breach of the SMP Agreement, SMP and the Plaintiffs have suffered damages in an amount to be determined at trial.

## SEVENTH ELEVENTH CAUSE OF ACTION
### Tortious Interference with the Noble Loan Agreement
### Defendants DXS, PacNet, Cooper, Noronha, Waterloo, Michael Riady, Stephen Riady, and LCR
### (Derivative on Behalf of SMP)

161.    31.Plaintiffs reallege the foregoing allegations.

49

162. ~~32.~~Defendants DXS, PacNet, Cooper, Noronha, Waterloo, Michael Riady, Stephen Riady, and LCR were aware of the Noble Loan Agreement ~~between CSM and Noble~~.

163. ~~33.~~These Defendants were also aware that SMP was <u>a Loan Party to, and</u> an intended beneficiary of~~,~~ the Noble Loan Agreement.

164. ~~34.~~By facilitating the sale of the Noble Loan to Waterloo, which is neither an affiliate of Noble nor an assignee approved by ~~the Company~~<u>SMP or its members</u>, and which is affiliated with a ~~Member of the Company~~<u>member of SMP</u>, these Defendants caused Noble to breach §§ 9.07(f) and (c) of the Noble Loan Agreement.

165. ~~35.~~In addition, these Defendants caused Noble to breach the requirements in §§ 9.07(b) and (c) requiring Noble to provide ~~the Company with~~ prior notice of any transfer of the Noble Loan.

166. ~~36.~~By causing Noble to breach the Noble Loan Agreement, these Defendants tortuously interfered with that contract to SMP's detriment.

167. ~~37.~~As a direct and proximate result of that tortious interference, SMP has suffered damages in an amount to be determined at trial.

~~**EIGHTH CAUSE OF ACTION**~~
~~**Breach of the Implied Covenant of Good Faith and Fair Dealing**~~
~~**Defendants DXS and PacNet**~~
~~38.    Plaintiffs reallege the foregoing allegations.~~

50

39. ~~DXS and PacNet had an implied covenant to exercise their blocking rights under the SMP and CSM Agreements in good faith.~~

40. ~~DXS and PacNet breached that duty by, among other things, exercising their blocking rights for the purpose of starving~~ the Company ~~of timely capital on reasonable terms in furtherance of the Lippo Group's concealed plan to~~ transfer ~~CSM's (and thus SMP's) assets to itself.~~

41. ~~As a direct and proximate result of DXS's and PacNet's actions, SMP~~ and ~~Plaintiffs have suffered damages in an amount to be determined at trial.~~

### ~~NINTH~~ **TWELFTH** CAUSE OF ACTION
### Breach of the Noble Loan Agreement
### Defendant Noble
### **(Derivative on Behalf of SMP)**

168. ~~42.~~Plaintiffs reallege the foregoing allegations.

169. ~~43.~~SMP was a Loan Party to, and an intended beneficiary of~~,~~ the Noble Loan Agreement.

170. ~~44.The Company has~~ SMP and CSM performed ~~its~~ their obligations under the Noble Loan Agreement.

171. ~~45.~~The Noble Loan Agreement prohibited Noble from selling or transferring the Noble Loan without prior notice ~~to CSM, without CSM's~~ or approval, or to an impermissible assignee.

51

172. 46. In breach of the Noble Loan Agreement, Noble agreed to sell the Noble Loan to Waterloo without prior notice to CSM, and without CSM's approval, and to an impermissible assignee in Waterloo.

173. 47. As a direct and proximate result of Noble's breach of the Noble Loan Agreement, SMP has suffered damages in an amount to be determined at trial.

### TENTH THIRTEENTH CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Defendant Noble
### (Derivative on Behalf of SMP)

174. 48. Plaintiffs reallege the foregoing allegations.

175. 49. SMP was a Loan Party to, and an intended beneficiary of, the Noble Loan Agreement.

176. 50. The Company has SMP and CSM performed its their obligations under the Noble Loan Agreement.

177. 51. In connection with the Noble Loan Agreement, Noble had an implied covenant to provide notice to CSM of any intended sale of the Noble Loan in good faith.

178. 52. Noble breached that duty by notifying CSM of its intent concealing its agreement to sell the Noble Loan to Waterloo on until the day before it was effectuated, thereby preventing CSM the parties from acting to prevent the sale and

52

depriving ~~CSM~~ SMP and its members of the benefit of the notice requirement in Section 9.07(b) of the Noble Loan Agreement.

179. ~~53.~~As a direct and proximate result of Noble's breach of its duty of good faith and fair dealing, SMP ~~and Plaintiffs have~~ has suffered damages in an amount to be determined at trial.

**~~ELEVENTH~~ FOURTEENTH CAUSE OF ACTION**
**Fraud**
**Defendant Noble**
**(in the alternative to the ~~Ninth~~ Twelfth Cause of Action)**
**(Direct on Behalf of SMI and CC and Single Derivative on Behalf of SMP)**

180. ~~54.~~Plaintiffs reallege the foregoing allegations.

181. ~~55.~~Noble made intentional misrepresentations to ~~CSM, SMP and~~ Plaintiffs and SMP of material fact and intentionally omitted material facts regarding its plan and agreement to transfer the Noble Loan to the Lippo Group including as to (i) Noble's willingness to sell the loan at a substantial discount; (ii) its negotiations and agreement with the Lippo Group to sell the Noble Loan through Waterloo; and (iii) the preparation of the Fourth Amendment to the Noble Loan Agreement in furtherance of its plan to sell the loan to the Lippo Group.

182. ~~Plaintiffs,~~SMP, SMI, and ~~CSM~~ CC justifiably relied on those misrepresentations. Noble went to great lengths to conceal its plan to sell the Noble Loan to the Lippo Group and the terms on which it intended to do so. Had ~~56.    Plaintiffs,~~SMP, SMI, and ~~CSM~~ CC known about Noble's plan and

53

agreement to sell the Noble Loan to the Lippo Group, they would not have provided authorized consents to the Fourth Amendment.

57. These Defendants' misrepresentations and omissions were intentional. Cooper, Noronha, PacNet, and DXS intended for SMP, Plaintiffs, and CSM to remain ignorant of the Lippo Group's secret dealings and illicit plan.

58. As a direct and proximate result of Cooper's, Noronha's, DXS's, and PacNet's fraud, SMP and Plaintiffs have suffered damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### Tortious Interference with Contract
### Defendants Cooper, Noronha, Waterloo, and LCR
59.    Plaintiffs reallege the foregoing allegations.

60. Defendants Cooper, Noronha, Waterloo, and LCR were aware of DXS and PacNet's obligations under the SMP and CSM Agreements.

61. In furtherance of the Lippo Group's illicit plan to acquire the Company or its assets, Defendants Cooper, Noronha, Waterloo, and LCR caused DXS and PacNet to breach its obligations under the SMP and CSM Agreements, including Sections 4.6(b) and 5.1(l)(ii) of the SMP Agreement.

62. By causing DXS and PacNet to breach the CSM and SMP Agreements, these Defendants tortuously interfered with those contracts to the Company's detriment.

63. As a direct and proximate result of that tortious interference, SMP and Plaintiffs have suffered damages in an amount to be determined at trial.

54

**THIRTEENTH CAUSE OF ACTION**
**Fraud**
**Defendants Cooper, Noronha, PacNet, and DXS**

64.     Plaintiffs reallege the foregoing allegations.

65. Cooper, Noronha, PacNet, and DXS made intentional misrepresentations to CSM,

SMP and Plaintiffs of material fact and intentionally omitted material facts

regarding their plan for the Lippo Group to acquire the Noble Loan, including as to

(i) Noble's willingness to sell the loan at a substantial discount; (ii) their

negotiations and agreement with Noble to acquire the Noble Loan through

Waterloo; (iii) the preparation of the Fourth Amendment to the Noble Loan

Agreement in furtherance of their plan to acquire the loan through Waterloo; (iv)

their plan to attempt to convert the WUMI Loan solely in order to enhance their

creditor position; and (v) their plan to force CSM into insolvency for the purpose

of acquiring it or its assets at a substantial discount.

Plaintiffs, SMP, and CSM justifiably relied on those misrepresentations.  These

Defendants went to great lengths to conceal their plan to harm 66.Plaintiffs, SMP,

and CSM and the success of their plan, in significant part, depended on that

concealment.  Had Plaintiffs known of these Defendants' ulterior motives,

Plaintiffs would not have continued to contribute funds to the Company and would

have acted to prevent these Defendants' from executing their plan.

183.   67.These Defendants' misrepresentations and omissions were

intentional.  Cooper, Noronha, PacNet, and DXS intended for SMP, PlaintiffsSMI,

55

and ~~CSM~~ CC to remain ignorant of the Lippo Group's secret dealings and illicit plan.

184. ~~68.~~As a direct and proximate result of Cooper's, Noronha's, DXS's, and PacNet's fraud, SMP ~~and Plaintiffs have suffered damages in an amount to be determined at trial.~~, SMI, and CC have suffered damages in an amount to be determined at trial.

~~**FOURTEENTH CAUSE OF ACTION**~~
~~**Breach of § 3.5 of the SMP Agreement**~~
~~**Defendants DXS and PacNet**~~
~~69.    Plaintiffs reallege the foregoing allegations.~~

~~70.    Defendant DXS and PacNet are parties to the SMP Agreement with Plaintiffs CC and SMI.~~

~~71. Plaintiffs have performed their obligations under the SMP Agreement.~~

~~72. Under Section 3.5 of the SMP Agreement, Board of Managers authorization was required for a member to possess a loan made to the Company~~ and, even where such a loan was authorized, the other members were entitled to participate on a pro rata basis.

~~73. Waterloo, an affiliate of DXS and PacNet, was this~~ prohibited from acquiring the Noble Loan without SMP's authorization.

~~74.    SMP did not authorize Waterloo's acquisition of the Noble Loan and, in fact, objected to it.~~

56

75. DXS and PacNet thus breached Section 3.5 of the SMP Agreement by assisting their affiliate, Waterloo, acquire the Noble Loan.

76. As a direct and proximate result of that breach of the SMP Agreement, Plaintiffs have suffered damages in an amount to be determined at trial.

**FIFTEENTH CAUSE OF ACTION**
**Unjust Enrichment**
**Against Tamra Mining Company, LLC**

77. Plaintiffs reallege the foregoing allegations.

78. Tamra Mining Company, LLC was formed by the Lippo Group for the sole purpose of purchasing CSM's assets out of bankruptcy at a severe discount to market value as part of the scheme set forth above.

79. As a result, Tamra Mining Company, LLC was unjustly enriched by paying approximately $40 million for assets worth over $600 million.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and derivatively on behalf of SMP, respectfully request the entry of a judgment:

1. Awarding to Plaintiffs SMI, CC, and SMP damages in an amount to be proven at trial;

2. Awarding to Plaintiffs SMI, CC, and SMP all costs and fees incurred in connection with this action, including reasonable attorneys' fees; and

57

3. Awarding all such other and further relief as the Court deems

appropriate.

*/s/ Rudolf Koch**Russell C. Silberglied*
_____
Russell C. Silberglied (#3462)

|  |  |
|---|---|
|  | Rudolf Koch (#4947) |
| OF COUNSEL: | Kevin M. Gallagher (#5337) |
|  | Anthony M. Calvano (#6265) |
| Jason C. Cyrulnik | RICHARDS, LAYTON & FINGER, P.A. |
| Edward J. Normand | One Rodney Square |
| Marc Ayala | 920 North King Street |
| BOIES SCHILLER FLEXNER LLP | Wilmington, DE 19801 |
| 333 Main Street | (302) 651-7700 |
| Armonk, New York 10504 |  |
| (914) 749-8200 | *Counsel for Plaintiffs Skye Mineral Investors, LLC and Clarity Copper, LLC* |

Christopher Grivakes, CA Bar No. 127994
Damion Robinson, CA Bar No. 262573
AFFELD GRIVAKES LLP
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 979-8700
Email: cg@agzlaw.com
*Admitted Pro Hac Vice*

Dated: ~~January 24~~March 11, 2018

58